892 F.2d 80
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Ray V. SHELTON, Betty L. Shelton, Plaintiffs-Appellants,
v.
UNITED STATES STEEL CORPORATION, Defendant-Appellee,
Resistoflex Company, Sterns Catalytic Corporation, Defendants.
 No. 89-3398.
 United States Court of Appeals, Sixth Circuit.
 Dec. 21, 1989.
 
 Before MILBURN and RALPH B. GUY, Jr., Circuit Judges, and LIVELY, Senior Circuit Judge.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 The plaintiffs, Ray Shelton and his wife Betty Shelton, appeal the district court's entry of summary judgment in favor of defendant United States Steel Corporation on their intentional tort claim for injuries sustained by Mr. Shelton while working in the defendant's plant. Because we agree with the district court that no genuine issue of material fact exists as to whether Mr. Shelton's injury constituted an intentional tort under Ohio law, we affirm the decision of the district court.
 
 I.
 
 2
 On July 18, 1984, Mr. Shelton (the plaintiff) and several others were injured in the defendant's chemical plant near Ironton, Ohio, when an expansion joint on a pipeline they were examining ruptured, spraying them with a chemical mixture including phenol and hydrochloric acid. The parties are in substantial agreement regarding the events leading up to the plaintiff's injury.
 
 
 3
 The accident occurred in a large semi-enclosed building known as the BPA unit, where bisphenol-A, a product used in the manufacture of high grade plastics, is produced. In order to make bisphenol-A, various chemicals including phenol, hydrochloric acid, acetone, and water are mixed in a series of eight large lineally-connected reactor vessels. As the mixture, called "slurry," flows from one reactor to the next, the chemical reaction progresses to completion. Each of the reactors is a large cylindrical glass-lined steel tank suspended approximately thirty feet above the concrete floor of the building. Adjacent to and several feet below the bottom of the reactors is a narrow steel-grated walkway allowing employees access to valves and controls at the bottom of each reactor.
 
 
 4
 A pipe eight inches in diameter extends from the bottom of the reactor designated R-101 to a pump on the concrete floor below. When the pump is activated and the main valve at the bottom of R-101 is open, the slurry mixture in the reactor flows downward and is pumped through a series of convoluted pipes where it is cooled before being returned to the reactor through a separate pipe. The main valve at the bottom of R-101 is connected to the descending slurry line by means of an expansion joint consisting of a pliable Teflon "bellows" with a steel flange at each end.
 
 
 5
 At the time of the accident, Shelton was the general foreman responsible for troubleshooting all operations within the BPA unit. When Shelton arrived at work on the morning of July 24, 1984, he was informed of a problem with the flow through R-101's slurry cooling system. He discussed the problem with other company personnel including Bill Art, superintendent of the BPA unit, and Terry Montgomery, the BPA unit process engineer. Shelton suggested that the flow problem might have been caused by improper adjustment of the main valve at the bottom of R-101, and proceeded, together with another worker, to the walkway beneath the reactor in order to check the valve. While waiting for a pipe fitter to remove an inspection plate on the valve, the plaintiff sought to verify that the eight-inch pipe was, as he had been told by other employees, empty of slurry. The standard procedure was to inject pressurized steam into the slurry line by means of a steam hose attached to a small inlet valve between the main valve and the expansion joint. Provided the line were clear, the steam would travel downward toward the pump where two small valves would be opened to allow the steam to escape into the air. Shelton opened the steam valve, allowing the steam to enter the slurry line. While the plaintiff was waiting for the steam to escape below, the Teflon bellows of the expansion joint, located just below the reactor valve, suddenly ruptured, spraying Shelton and another employee with the chemical mixture that remained in the slurry line.
 
 
 6
 According to plaintiff's affidavit opposing defendant's motion for summary judgment, at or before the time he opened the steam valve Montgomery was flushing the slurry line with hot water from a hose he had attached to one of the drain valves at the bottom of the line. Shelton states in his affidavit that "[t]his was not ask[ed] of him and should not have been done." In his affidavit, Shelton maintains that Montgomery's action was the most likely cause of the expansion joint rupture. Shelton first explains that by attaching the hose to one of the bleeder valves, Montgomery prevented much of the steam from escaping. The affidavit continues as follows:
 
 
 7
 I believe that the small amount of steam I started at the top of the Slurry line hit the condensate that was added by Terry Montgomery, caused the line to water hammer and exerted a hydraulic force great enough to cause the weakest point, expansion joint, to fail.
 
 
 8
 The defendant has expressed no opinion as to the cause of the rupture.
 
 
 9
 On July 14, 1986, plaintiff filed suit in the Court of Common Pleas, Scioto County, Ohio, against United States Steel, Resistoflex Corporation, the manufacturers of the expansion joint, and Catalytic Company, which installed and inspected the joint. The claims, based on various tort theories under Ohio law, were removed to the United States District Court for the Southern District of Ohio on the basis of diversity jurisdiction. 28 U.S.C. §§ 1332, 1441. The plaintiff settled all claims against Resistoflex and Catalytic Company, leaving only the intentional tort claim against United States Steel. On April 3, 1989, the district court entered the summary judgment in favor of United States Steel from which plaintiff now appeals.
 
 
 10
 The standard to be applied by a district court in considering a motion for summary judgment is set out in Federal Rule of Civil Procedure 56(c):
 
 
 11
 The judgment sought shall be rendered forthwith if the pleadings, ... together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
 
 
 12
 The Supreme Court has clarified this standard with the following language:
 
 
 13
 [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.
 
 
 14
 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted). In examining the record to determine whether a genuine issue of material fact exists, the district court must review all evidence in the light most favorable to the non-moving party, and "all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255.
 
 
 15
 This court reviews a district court's grant of summary judgment de novo, see McKee v. Cutter Laboratories, Inc., 866 F.2d 219, 220 (6th Cir.1989); Storer Communications, Inc. v. National Ass'n of Broadcast Employees and Technicians, AFL-CIO, 854 F.2d 144, 146 (6th Cir.1988), albeit with the understanding that "the judgment of a local district judge sitting in a diversity case, as to the application of state law, is entitled to considerable deference." Diggs v. Pepsi-Cola Metro. Bottling Co., 861 F.2d 914, 927 (6th Cir.1988) (citations omitted).
 
 II.
 
 16
 In Blankenship v. Cincinnati Milacron Chem., Inc., 69 Ohio St.2d 608, 433 N.E.2d 572, cert. denied, 459 U.S. 857 (1982), the Supreme Court of Ohio held that the provisions of the Ohio Constitution and statutes granting immunity from tort liability to employers for work-place injuries do not preclude an employee from seeking damages against his employer at common law for an intentional tort. The court defined the contours of intentional tort for the purposes of Blankenship in Van Fossen v. Babcock & Wilcox Co., 36 Ohio St.3d 100, 522 N.E.2d 489 (1988), and two companion cases, Pariseau v. Wedge Prods., Inc., 36 Ohio St.3d 124, 522 N.E.2d 511 (1988) (per curiam) and Kunkler v. Goodyear Tire & Rubber Co., 36 Ohio St.3d 135, 522 N.E.2d 477 (1988). In Van Fossen, the court set forth the essential elements of an intentional tort claim by an employee against his employer:
 
 
 17
 [W]e hold that in order for "intent" to be found for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within his business operation; (2) knowledge by the employer that if employees are required by virtue of their employment to be subjected to such dangerous process, procedure, instrumentality or condition, then harm to them would be a substantial certainty, and not just a high risk; (3) that the employer, under such circumstances, and with such knowledge, did act to so require the employee to continue performing his employment tasks.
 
 
 18
 36 Ohio St.3d at 116, 522 N.E.2d at 504.
 
 
 19
 Phrased another way, in order to recover damages, a plaintiff-employee must demonstrate that "the employer or his agent manifested an intent to injure the employee and this intent includes the knowledge and expectation that such an injury is substantially certain to occur." Pariseau, 36 Ohio St.3d at 129, 522 N.E.2d at 516.
 
 
 20
 The sole evidence plaintiff has submitted in support of his claim of intentional tort is his own affidavit. The affidavit contains several factual claims relating to the accident, each of which is reproduced in the plaintiff's brief on appeal. The affidavit fails, however, to adduce evidence sufficient to support a conclusion that United States Steel knew that the cause of injury in this case, the rupture of the expansion joint, was substantially certain to occur. Accordingly, we hold that plaintiff's factual assertions, when taken together, do not raise a genuine issue of material fact. Although our holding is based on an examination of the totality of the evidence, for the sake of clarity we address each assertion individually.
 
 
 21
 The first evidence produced by the plaintiff is relevant to the danger of the chemicals contained in the slurry mixture. The plaintiff states that hydrochloric acid and phenol are both on the E.P.A.'s list of hazardous chemicals, and that hydrochloric acid is considered "very dangerous" by the E.P.A. This information is only relevant, of course, if the plaintiff establishes that United States Steel knew with substantial certainty that the plaintiff would be exposed to these chemicals. Shelton proceeds to adduce facts which, he maintains, demonstrate that the defendant knew the dangerous chemicals were substantially certain to escape through the expansion joint. He offers the observation that hydrochloric acid is "very hard to contain," and that the French company from which the production methodology for producing bisphenol-A was adopted "warned U.S.S. of its dangerous propensities." The vagueness of both these statements renders them useless as proof of the likelihood of the particular incident at issue here, for it is not the aggregate danger involved in the overall process of producing bisphenol-A that is relevant in determining this case. Intent, for the purposes of finding an intentional tort under the Van Fossen test, requires that the defendant know, with substantial certainty, " 'the exact dangers which ultimately caused' injury." Sanek v. Duracote Corp., 43 Ohio St.3d 169, 172, 539 N.E.2d 1114, 1117 (1989) (quoting Van Fossen, 36 Ohio St.3d at 112, 522 N.E.2d at 501).
 
 
 22
 Shelton next notes that "the original pressure-sensitive elements in the reactors were changed from 14 p.s.i. to 67 p.s.i." Unfortunately, the plaintiff has not seen fit to explain the relevance of this fact either in his affidavit or in his brief to this court. We are therefore left to accept the defendant's uncontroverted assertion that the "pressure-sensitive elements" referred to concern pressure within the reactor vessel itself and not within the slurry line or the expansion joint. In any case, Shelton admitted in his deposition that, at the time the decision to change the aforementioned pressure-sensitive elements was made, he had felt that the change posed no safety problem. This evidence must, therefore, be considered irrelevant.
 
 
 23
 The plaintiff next notes that an air-operated valve, capable of being opened from a remote location, and "required to be opened by Shelton in [the] cleaning process," had been replaced by a manual gear-operated valve. The unstated implication is that the valve replacement created the danger of the injury at issue here by requiring the plaintiff to place himself in jeopardy unnecessarily. The defendant contends, again without contradiction, that the valve the plaintiff refers to was not the steam valve actually opened by Shelton. If this is true, the replacement of the valve was irrelevant to the injury at issue here. Shelton's answers to deposition questions on the subject of the replaced valve, unclear as they are, appear to confirm the defendant's assertion. Once again, therefore, we can not consider this evidence relevant to a determination of "intent" in this case.
 
 
 24
 The plaintiff next contends that the expansion joint was "hidden from view" by insulation and had no visible warning sign. We are confronted here with yet another assertion of fact entirely unadorned by plaintiff's counsel with explanation or argument. In any case, the plaintiff appears to contend that the defendant's failure to warn of the presence of the expansion joint made it more likely than otherwise that Shelton would employ the steam injection procedure. In his own deposition, however, Shelton expressed doubt that he would have acted any differently had he known of the location of the joint. Here again, plaintiff's evidence appears irrelevant to the issue of the substantial certainty of injury.
 
 
 25
 Plaintiff's affidavit contains a general assertion that the slurry cooler system had suffered "leaks of damaging liquid around the cooler expansion joints, leaks in u-bend tubes and gasket leaks." The plaintiff has failed to produce any evidence of the severity of these leaks, or to demonstrate in what way they may be related to the injury at issue in this case. In the same vein, Shelton contends that the "spare parts supply had been depleted in attempts to maintain reactors," and that parts had been removed from some reactors and placed on others. Again, the plaintiff has failed entirely to establish any logical link between these facts and the expansion joint rupture.
 
 
 26
 Shelton contends that the expansion joint "was subjected to damaging atmospheric vapors" since its installation in 1976. The plaintiff fails, however, to indicate, whether, or to what extent, damage was actually done, and whether the alleged damage could be a cause of the rupture at issue here. This assertion is simply too vague to assist in determining whether the rupture was substantially certain to occur.
 
 
 27
 The plaintiff next informs the court of the "lack of pressure relief safety valves on the lines or coolers." Whether the absence of such safety valves contributed to the "water hammering" which allegedly caused the rupture is left entirely to the imagination. Plaintiff has produced no evidence whatsoever that would indicate that the presence of relief valves would affect the safety of the cooling system one way or another.
 
 
 28
 The plaintiff also contends that no safety shield was installed on the joint to prevent injury from occurring as a result of rupture, and that the safety showers to which Shelton was taken after the accident were not adequately maintained. Had the plaintiff adduced evidence sufficient to establish that the joint was substantially certain to rupture, the absence of a shield and of functioning safety showers would be relevant to the question of whether injury was substantially likely to result from rupture. Because of the absence of evidence indicating that rupture was substantially certain to occur, however, we need not address the absence of a shield or the adequacy of the showers. See Van Fossen, 36 Ohio St.3d at 117, 522 N.E.2d at 504.
 
 
 29
 The affidavit alleges that R-101 and its piping were last inspected over six years before the accident. Even if this allegation is true, however, it does not lead to the conclusion that rupture of the joint was substantially certain to occur. In fact, the failure to inspect would seem most relevant to the issue of whether the defendant in fact knew that the joint was substantially certain to rupture. The fact that no inspection was performed would tend to indicate that it did not.
 
 
 30
 Plaintiff asserts that by the date on which he was injured, "all other expansion joints had been replaced except for the joint which ruptured...." This record of replacement may very well be relevant to a determination of whether defendant was aware of difficulties with the joints. Without the slightest clue as to why the joints were replaced, however, the mere fact of replacement carries little evidentiary weight.
 
 
 31
 The plaintiff's strongest contention is that the likelihood of the joint rupturing was indicated by prior failures of expansion joints on other reactors. The plaintiff's brief quotes his affidavit as follows:
 
 
 32
 9. Prior failure of expansion joints occurred:
 
 
 33
 (a) On D-313 (Mother Liquor Drum) due to the steaming of a line causing injury to Herb Covert, A. Stump and another.
 
 
 34
 (b) Expansion joint failed at the Emico filter from steaming line.
 
 
 35
 (c) Expansion joints failed on and around D-709, acid drum containing hydrochloric acid.
 
 
 36
 (d) Several failures of expansion joint on P-703 A/B (acid feed pump) with no injury.
 
 
 37
 The plaintiff is correct in asserting that evidence of prior accidents involving procedures and equipment similar to those causing the injury at issue may be sufficient to defeat a defendant's motion for summary judgment in a case applying the Van Fossen test. See, e.g., Van Fossen, 36 Ohio St.3d at 118, 522 N.E.2d at 505; Pratt v. National Distillers & Chem. Corp., 853 F.2d 1329, 1336-37 (6th Cir.1988), cert. denied, 109 S.Ct. 1121 (1989). The existence of prior accidents involving the same procedures will often show that the defendant knew the accident at issue was substantially certain to be repeated. The facts of Kunkler v. Goodyear Tire & Rubber are particularly illustrative of this point. In that case, the plaintiff was injured by an explosion while mixing chemical ingredients according to a pre-established procedure. Plaintiff submitted the affidavit of another employee who swore that on three prior occasions he had experienced explosions as a result of the mixture of the same ingredients according to the same procedure. The affiant also swore that on each occasion he had reported the explosion to the area supervisor who instructed him to "run the thing anyway." 36 Ohio St.3d at 139, 522 N.E.2d at 481. The Supreme Court of Ohio found that the question whether or not the affidavit was accurate presented a genuine issue of material fact sufficient to defeat summary judgment. The evidence of prior accidents offered by the plaintiff here, however, is in no way comparable to that presented in Kunkler. First, we note that the plaintiff has not indicated anywhere in the record whether the alleged joint failures outlined in his affidavit occurred before or after the date of his own injury in 1984. Nor has he stated with sufficient directness whether the "failures" involved the steam injection process that caused the injury at issue here. Nor are the extent and danger of the failures referred to indicated, except for the vague statement that "injury" resulted from the failure delineated in (a). Because of the vague nature of plaintiff's assertions regarding these prior joint failures, we agree with the district court that they do not raise a genuine issue of material fact as to whether or not the defendant knew with substantial certainty that the joint on R-101 would rupture causing injury.
 
 
 38
 After de novo review of the plaintiff's arguments, we agree with the district court that the evidence contained in the affidavit, when taken as a whole, cannot be read to establish a genuine issue of fact that is material as to whether the plaintiff's injury constituted an intentional tort. As the Ohio Supreme Court stated in Van Fossen:
 
 
 39
 There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved. Such conduct may be characterized as gross negligence or wantonness on the part of the employer. However, in view of the overall purposes of our Workers' Compensation Act, such conduct should not be classified as an "intentional tort" and therefore an exception, under Blankenship or Jones v. VIP Development Co., 15 Ohio St.3d 90, 472 N.E.2d 1046 (1984), to the exclusivity of the Act.
 
 
 40
 36 Ohio St.3d at 117, 522 N.E.2d at 504-05.
 
 
 41
 The judgment of the district court is AFFIRMED.