74 F.3d 1240
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Walter FEISTNER, et al., Plaintiffs-Appellants,
v.
FORD MOTOR COMPANY, et al., Defendants-Appellees.
 No. 94-4127.
 United States Court of Appeals, Sixth Circuit.
 Jan. 10, 1996.
 
 Before: LIVELY, KENNEDY, and RYAN, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Plaintiff Walter Feistner appeals the grant of summary judgment for his employer, Fort Motor Company, in Feistner's claim of intentional tort against Ford for injuries suffered on the job. We are unpersuaded that the district court erred and, therefore, we will affirm.
 
 I.
 
 2
 Walter Feistner was injured on May 21, 1992, while employed as a maintenance electrician at Ford's Avon Lake, Ohio, assembly plant. At the time of his injury, he was working at a control station located in an area of the plant known as the IP basket level, which was located one story above the cement floor.
 
 
 3
 Feistner's job was to control the WP-19 and WP-20 conveyor lines. WP-19 conveyed full-sized van bodies, and WP-20 conveyed the minivan bodies. Feistner altered the mix of different van bodies in accordance with the instructions of production foremen on the cement floor below, as communicated through hand signals and shouted commands. The conveyor line system was originally designed to be operated by automatic controls located on the main production floor. However, when Ford began its new Villager minivan line, it instituted manual control of the lines from the IP basket level in order to increase productivity through manipulation of the ratio of full-sized vans to minivans. Feistner often left his work station and stepped over one of the conveyors, which was 18"' high and 24"' wide, in order to hear or see the foremen's instructions. Some short distance from Feistner's controls, the WP-19 and WP-20 conveyor lines merged at a track switch that was ordinarily passive but snapped to the alternate position when a car body was moved through the area. The "floor" in the basket area over which Feistner traveled when he left his work station was not rigid because it was constructed of wire mesh webbing, and it was characterized by one witness as being "springy." Walking on the wire mesh presented obvious tripping hazards. Although Feistner had tripped on numerous occasions before the day of his accident, he had not fallen. Others had also tripped when working in the IP basket area, but no one had ever been injured.
 
 
 4
 Ford foremen were aware that Feistner was crossing the conveyor line from time-to-time to hear orders being shouted to him from the main floor. Ford foremen had, themselves, also crossed over this conveyor line at the IP basket level. Feistner's predecessor, Ralph Bound, had previously complained to Ford and to the UAW safety representative that the IP basket level was isolated and unsafe. Forrest Greenleaf, health and safety representative for the UAW at the Ford Avon Lake Plant told Charles Minnich, Ford's safety representative, that the IP basket area where Feistner was working was an unsafe place to work.
 
 
 5
 Shortly before the accident, Feistner heard his name shouted out and started to cross the conveyor line in order to find out who had shouted his name and to receive his orders. He tripped and stumbled, taking a number of steps in an effort to regain his balance:
 
 
 6
 Q: And did you stumble, then, the entire way into the track switch?
 
 
 7
 A: I was going, like, drunk back and forth. I couldn't stop.
 
 
 8
 According to Feistner, when he fell, his hands entered the passive track switch on the conveyor. At the same time, a vehicle passed through the area and the track switch snapped into a pinching position, causing the partial amputation of Feistner's hands. Apparently, no one observed Feistner tripping, stumbling, and falling.
 
 II.
 
 9
 Normally an employee is prohibited from prosecuting an action at law against his employer and must, instead, seek compensation under the Ohio Workers Compensation Act. See Ohio Const. art. II, and Ohio Rev.Code Sec. 4123.74. However, Feistner seeks to pursue this action in tort under one of the limited exceptions to the workers compensation rule. Employees are not precluded by Sec. 35, art. II of the Ohio Constitution, or by the Ohio Code, from enforcing their common law remedies against employers for intentional torts. See Blankenship v. Cincinnati Milacron Chemicals, 433 N.E.2d 572, cert. denied, 459 U.S. 857 (1982).
 
 III.
 
 10
 We review a grant of summary judgment de novo. Brooks v. American Broadcasting Companies, 932 F.2d 495, 500 (6th Cir.1991). In conducting this review, we view the evidence in the light most favorable to the nonmoving party, here Feistner, and determine whether all the evidence before the district court "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to [a] judgment as a matter of law." ' Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988) (quoting Fed.R.Civ.P. 56(c)); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). If a reasonable factfinder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment.
 
 IV.
 
 11
 Feistner's burden is to prove by a preponderance of direct or circumstantial evidence that Ford is liable in intentional tort. In Fyffe v. Jeno's, Inc., 570 N.E.2d 1108 (1991), the Ohio Supreme Court explained that to establish intent for the purpose of proving an employer's intentional tort, the employee must demonstrate:
 
 
 12
 (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.
 
 
 13
 Id. at 1112.
 
 
 14
 Of course, more is required to prove intentional tort than to prove negligence or recklessness. The Ohio Supreme Court has stated:
 
 
 15
 Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk--something short of substantial certainty--is not intent.
 
 
 16
 Id.
 
 
 17
 Ford argues that the plaintiff has failed to introduce evidence that creates a genuine issue as to the alleged substantial certainty of the injury. Although the absence of a prior occurrence of injury of the same type does not preclude liability for intentional tort, plaintiff carries the burden of proving "by a preponderance of the evidence that the employer had 'actual knowledge of the exact dangers which ultimately caused' injury." Sanek v. Duracote Corp., 539 N.E.2d 1114, 1117 (Ohio 1989) (quoting Van Fossen v. Babcock & Wilcox Co., 522 N.E.2d 489, 501 (Ohio 1988)).
 
 
 18
 Under Ohio law, an employer's conduct must be genuinely egregious before an injured employee is permitted to avoid the bar of the exclusive remedy provision of the state's workers' compensation scheme. "The critical inquiry in an intentional tort case is the likelihood that injury will occur." Cantrell v. GAF Corp., 999 F.2d 1007, 1016 (6th Cir.1993). An Ohio court found no jury question of intentional tort where an employer required an employee to use his hands instead of a wooden stick to remove finished articles from a punch press, even though the machine had been "repeating" earlier in the evening and another employee had refused to operate it. Pariseau v. Wedge Prods. Inc., 36 Ohio St.3d 124 (1988). On the other hand, this court found a jury question of intentional tort where an employer had knowledge that injury and death were substantially certain to result from asbestos exposure but continued to expose employees to asbestos and did not notify employees when medical screening revealed the presence of the disease. Cantrell, 999 F.2d 1007.
 
 V.
 
 19
 The court below found that Feistner's injury was caused by the unusual combination of tripping, stumbling for a distance, falling at a particular place, and the timing of the vehicle triggering the passive switch:
 
 
 20
 Feistner does not address the statistical probability (the degree of risk) that he would not only trip, but also stumble, then fall. If Feistner had tripped and stumbled, but not fallen, his hands would not have gone into the switch. No one had fallen (as opposed to tripping) in the past three to four months near plaintiff's location.
 
 
 21
 Feistner does not address the statistical probability, assuming he would trip, stumble, then fall, that the fall would result in his hands going into the passive track switch. If he had tripped and fallen immediately, his hands would not have gone into the switch. If he had stumbled in a different direction, or slightly farther, his hands would not have gone into the switch. Feistner's work station was a number of feet away from the passive track switch. There was no job requirement that he have any contact with that switch and no job requirement that he place his hands in or near the switch.
 
 
 22
 Feistner does not address the statistical probability of accidentally timing the fall to coincide with when the switch changed position. Had Feistner fallen a short while earlier or later, his hands would not have been in the track when the switch snapped into the other position.
 
 
 23
 The lack of a previous incident similar to that suffered by Feistner, the fact Feistner's hands were injured while in a position which was not part of his normal job, plus the fact his hands came into that position only by reason of a highly unlikely combination of tripping, stumbling, falling, and timing, lead to the conclusion that Feistner's injuries were not substantially certain.
 
 
 24
 We adopt the reasoning of the magistrate judge, with one clarification. Although the magistrate judge refers to Feistner's failure to address the "statistical probability" that Feistner would incur the injury he ultimately suffered, this language should not be construed to require plaintiffs to introduce evidence of sophisticated statistical analyses as a condition of proving a claim of intentional tort. Rather, we affirm the grant of summary judgment for the defendant employer because Feistner's injury resulted from a series of unlikely events, and yet he failed to submit any evidence demonstrating that these events were substantially certain to occur in a way that would culminate in injury to Feistner. If Feistner had not stumbled in a fashion that carried him forward for some distance and then fallen into the ordinarily passive track switch at the moment the switch became active and changed positions, he would not have incurred the serious injury he suffered. Feistner failed to submit evidence, for example, that his stumbling path into the switch was a likely pattern, or that the switch changed positions so frequently that injury was substantially certain to occur if an employee fell into it. Because there is so little evidence about the likelihood of these matters, no reasonable juror could conclude that the injury was substantially certain to occur.
 
 VI.
 
 25
 We AFFIRM the grant of summary judgment in favor of the defendant.