PARISEAU, APPELLEE, *v.* WEDGE PRODUCTS, INC., APPELLANT.

[Cite as Pariseau *v.* Wedge Products, Inc. (1988), 36 Ohio St. 3d 124.]

(No. 87-828—Decided April 13, 1988.)

*Sindell, Lowe & Guidubaldi Co., L.P.A.,* and *Claudia R. Eklund,* for appellee.

*Petro, Rademaker, Matty & McClelland, Robert C. McClelland* and *James M. Petro,* for appellant.

*Vorys, Sater, Seymour & Pease, Russell P. Herrold, Jr.,* and *Robert A. Minor,* urging reversal for *amicus curiae,* Ohio Manufacturers' Assn.

*Mansour, Gavin, Gerlack, & Manos Co., L.P.A., Ernest P. Mansour* and *Eli Manos,* urging reversal for *amici curiae,* Crawford Fitting Co. et al.

*Per Curiam.* Once again, we are asked to distinguish between a factual

situation in the workplace giving rise to an inference of aggravated negligence or reckless disregard for the rights of another and one giving rise to the legal concept of an intentional tort. As explained in *Kunkler* v. *Goodyear Tire & Rubber Co.* (1988), 36 Ohio St. 3d 135, 139, 522 N.E. 2d 477, 481, "[t]o establish an intentional tort there must be proof beyond that required to prove negligence and beyond that to prove recklessness. It is in this context that the facts should be examined to determine whether an employer has acted despite a known threat that harm to an employee is substantially certain to occur."[1]

Unlike *Kunkler,* the record here does not contain even the suggestion that appellant's foreman intended to injure appellee or that appellee's superior placed him in a deadly or extremely dangerous working environment with the foreknowledge that he would be killed or injured. As stated in Prosser & Keeton, The Law of Torts (5 Ed. 1984) (hereinafter referred to as "Prosser"), "* * * the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent." *Id.* at 36, Section 8.

Testimony in the case at bar suggested that the injury was proximately caused by improper adjustment of pullback restraint guards on the press used by appellee. There was no direct evidence on this point, and at best, the record reflects but an inference of such negligence. Evidence was also offered that the 2/11 press had suffered from brake malfunction in the past, which malfunction may inferentially have contributed to appellee's injury. The trial court, however, found the record devoid of direct evidence on this issue as well. A reading of the record, however, could lead to the inference that such a malfunction proximately contributed to appellee's injury.[2] Counsel for the plaintiff conceded that there were only two possible causes for the accident — maladjustment of the pullback restraint guards and breakage of a bolt in the press.

The trial judge noted that direct evidence showed that the 2/11 press had "repeated" on several occasions. This tendency inferentially may also have been a proximate cause of appellee's injury. Further, there was testimony that this very press had been involved in an earlier accident,

---

[1] Comment *b* to Section 8A of 1 Restatement of the Law 2d, Torts (1965) 15, expresses the differences among negligence, recklessness, and intentional tort and addresses the precise point at issue when it states:

"* * * If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness, as defined in § 500. As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence, as

defined in § 282. All three have their important place in the law of torts, but the liability attached to them will differ." See, also, Prosser & Keeton, Law of Torts (5 Ed. 1984) 35, Section 8.

[2] The record we face is totally dissimilar to that in *Kunkler,* where there was evidence that it was certain or virtually certain that the defendant employer was well aware that the materials provided to the injured party were explosive and would explode on use and yet ordered Kunkler to proceed despite such foreknowledge. Indeed, appellee's own testimony in the instant case puts to lie even a suggestion that his foreman acted with malice aforethought.

the circumstances of which are not clear from the record.[3] Inferentially, claimant's foreman may well have been aware that the 2/11 press put its user at some degree of risk.

While we are aware that the grounds for granting a judgment n.o.v. are not easily met, a motion for such a judgment must be sustained when circumstances so require.

"The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict. The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions."

*Posin* v. *A.B.C. Motor Court Hotel* (1976), 45 Ohio St. 2d 271, 275, 74 O.O. 2d 427, 430, 344 N.E. 2d 334, 338; *McNees* v. *Cincinnati Street Ry. Co.* (1949), 152 Ohio St. 269, 40 O.O. 318, 89 N.E. 2d 138; *Ayers* v. *Woodard* (1957), 166 Ohio St. 138, 1 O.O. 2d 377, 140 N.E. 2d 401; Civ. R. 50(A) and (B). However, it is noteworthy that the burden to demonstrate knowledge amounting to a substantial certainty that an injury would take place never leaves the plaintiff. See *Van Fossen* v. *Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, 522 N.E. 2d 489.

In the instant case, the trial court, in the course of its written opinion, carefully reviewed the evidence and properly sustained appellant's motion for a judgment n.o.v. Judge Tyack, construing the evidence most strongly in favor of appellee, found that the various acts of negligence alleged by appellee failed to constitute an "intentional tort," as established in *Jones* v. *VIP Development Co.* (1984), 15 Ohio St. 3d 90, 15 OBR 246, 472 N.E. 2d 1046.[4] We agree with his analysis.

---

[3] The record reflects that a prior accident occurred in 1976 involving one Verde Adams who suffered a severe hand injury. The record belies any assertion that the accident was caused by a "repeat" factor, supports the contention that there was a malfunction in one of the press' functional parts and indicates that the injury was probably caused by maladjustment in Adams' hand restraints.

[4] In its decision, the trial court stated:

"While this Court realizes that a jury is a trier of disputed facts some of the claims as to the negligent acts of the defendant were not supported by probative evidence. One of the claims, namely that of the improper adjustment of the hand restraints, was commented upon by plaintiff's experts and argued extensively by plaintiff's counsel. Peculiarly, there was no evidence, in this Court's opinion, to support this facet

of the claim. The only people with direct knowledge of the hand adjustments were George Miller, the foreman for the defendant who did the adjusting, and the plaintiff. Miller denied any failure to properly adjust the hand restraints and the plaintiff, upon cross-examination, stated he was not aware of any problems as to the adjustment of the restraints.

"While plaintiff claimed a failure of the brake, and prior notice of the claim of defective brakes, as part of the case, the court notes there was no evidence of brake failure to support this position, in fact, the evidence, in this Court's opinion, supported the position that the machine was regularly checked and in fact inspected the day after plaintiff's unfortunate accident, and there was no defect found in the brakes. The court realizes that, at least on the issue of the 'repeating,' this was within the jury's province. There was evidence, however, to

Judge Tyack, in effect, put forth this question: How can any reasonable person find that Wedge Products and/or its foreman knew, with any degree of certainty, that an injury was bound to occur given the record in this case?[5]

The court of appeals properly held that the jury could have found inferentially that "* * * the press repeat was due to overheated brakes and the failure of the pullback guards was due to improper adjustment." What the court of appeals failed to discern was that these conditions were the result of negligence, not intentional misconduct.

The whole concept of actions premised upon intentional torts in the workplace has been the subject of intense interest in this state in recent years. As Justice Herbert Brown pointed out in *Kunkler, supra,* this court's decision in *Jones* v. *VIP Development Co., supra,* leaves questions open with respect to just what constitutes "substantial certainty." In *Kunkler,* Justice Brown, citing Prosser with approval, adopted the Restatement of the Law 2d, Torts definition of intent and applied it to a case similar to that before us. Justice Herbert Brown, expanding on and explaining the semantic shortcomings of *Jones,* alluded to the differences among negligence, recklessness, and intentional tort, and specifically approved both the Prosser and Restatement rationales. See, also, *Van Fossen, supra.*

To establish an intentional tort, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. If the actor knows that the consequences are certain, or substantially certain, to result from his act and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases and becomes less than substantial certainty, the actor's conduct loses the character of intent and becomes mere recklessness. As the probability decreases further and

---

indicate the operator of the machine could effectuate a repeat by failing to use a foot device properly.

"It seemed to be agreed by all parties concerned that even upon a 'repeat' the hand restraints should have pulled the persons [sic] hands out of any area of danger prior to any mishap. The court will comment that a mechanical failure or even negligence on the part of the plaintiff [sic] in permitting the injured employee to operate the machine would hardly constitute an intentional tort. While the evidence was quite clear that the plaintiff was a relatively new employee of the company he nevertheless, apparently in keeping the company policy, had been exposed to various equipment at the shop. Furthermore, although a new employee with the defendant corporation, the plaintiff represented himself, as having, considerable experience [in the] operating of similar equipment. The testimony is supported by plaintiff's past employment record. Also, it is interesting to note that the plaintiff had worked on the machine for approximately one hour before his mishap and, if the court recalls the figures correctly was on his two hundredth piece, which was to be the last piece for the day, at the time of the mishap. It is reasonable to assume, in the absence of any testimony to the contrary, that during the period of time the plaintiff was operating the press it was functioning satisfactorily.

"As far as the repeating propensities of the press, it would appear that following each complaint the machine was checked out by the supervisory personnel who were unable to effectuate any repeats. This is important because the defendant corporation denied any knowledge of actual repeats although there had been some complaints previously."

[5] Indeed, a directed verdict may well have been the more appropriate resolution of this matter.

amounts only to risk that the result will follow, it becomes ordinary negligence. Restatement of the Law 2d, Torts, Section 8A, Comment *b*; *Jones v. VIP Development Co., supra,* explained; *Van Fossen v. Babcock & Wilcox Co., supra; Kunkler v. Goodyear Tire & Rubber Co., supra,* followed.

Thus, to establish that an employer has committed an intentional tort against an employee so as to allow the employee to recover damages, a plaintiff-employee must demonstrate by a preponderance of the evidence that the employer or his agent manifested an intent to injure the employee and this intent includes the knowledge and expectation that such an injury is substantially certain to occur.

Therefore, the question in these cases becomes: Weighing the evidence and inferences favorable to the employee, is there reliable, probative evidence to show that the employer intentionally acted in this matter despite a known threat of harm to the employee, using the substantial certainty test noted above? We think it is obvious that such a situation did not prevail in the instant case.

We have already disposed of the legislative effort to "limit" this particular form or cause of action by holding that R.C. 4121.80(G)(1) may not be applied retroactively.[6] Further, it can hardly be argued that legislative efforts to limit, expand, or even abolish common-law actions are facially unconstitutional.

In any event, we hold that the court of appeals erred in reversing Judge Tyack's granting of judgment n.o.v.

Accordingly, the judgment of the court of appeals is reversed and that of the trial court is reinstated.

*Judgment reversed.*

MOYER, C.J., WRIGHT and H. BROWN, JJ., concur.

HOLMES, J., concurs separately.

LOCHER, SWEENEY and DOUGLAS, JJ., dissent.

HOLMES, J., concurring. The evidence presented in this case readily shows the difficulty that may arise in determining the existence of the so-called intentional tort claimed to have been committed by an employer against his employee. There is little room to doubt that we are here confronted, upon review of the trial court's granting of a motion for judgment n.o.v., with testimonial evidence which, as accepted by the jurors, would establish conduct amounting to recklessness, which is well beyond mere negligence. However, there is a missing link in the proof necessary for the establishment of an intentional tort, a most necessary link, which is evidence that the employer had the required knowledge that the event was substantially certain to occur.

As we stated in *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, 522 N.E. 2d 489, at paragraph six of the syllabus: "To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. * * * However, the mere knowledge and appreciation of a risk — something short of a substantial certainty — is not intent."

We guide our analysis of whether

---

[6] For an exhaustive and scholarly analysis of this issue, see *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, 522 N.E. 2d 489.

entry of judgment n.o.v. was proper by paragraph five of the syllabus of *Van Fossen, supra,* which requires that: "* * * [I]n order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge * * * that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty and not just a high risk; and (3) that the employer * * * did act to require the employee to continue to perform the dangerous task."

Therefore, we must first inquire whether there was evidence that a dangerous condition existed and that the employer knew of it. There was considerable testimony, set forth in nearly absolute terms, that the 2/11 punch press at issue was known to "repeat" its cycle, which means that the ram descended at a time when the operator might ordinarily have his hand(s) within the breech for the purpose of removing the completed part. A former maintenance specialist testified that he informed the management orally and in writing that the machine repeated, and therefore jeopardized the hands of the operator. He recommended that particular safety systems be installed, which was not done. Employees testified that they and other employees had experienced instances of repeat ram strokes by the 2/11, that they were frightened of operating the machine, and would do so only when they could use a 2x4 inch piece of wood or a stick to remove the finished parts. There was corroborating testimony of one employee that she had operated the machine the very night of the accident, and had refused to operate it further after it began to repeat. Moreover, after informing the foreman of this situation, which all the employees testified to doing, and refusing to further operate the machine at issue, she observed the foreman assign appellee to the machine. Appellee testified that the foreman removed the 2x4 inch piece of wood from the area, refused to explain its use to him, and instructed him to use his hands to remove the parts. In other words, there was sufficient credible evidence which demonstrated that the foreman subjectively and specifically knew that, for whatever reason, the 2/11 punch press occasionally repeated.

Furthermore, the foreman and company knew that there was a considerable risk of serious harm even if its hand pullback safety devices were functional. There was testimony that, just two years prior to appellee's injuries, one Verde Adams had lost three fingers from his hand when this very machine repeated, due to accidental jamming. The former maintenance specialist testified that he and other employees had to remove the pullback harness from Adams' hand which was held within the pinch points, "because it [the pullback device] was pulling on him real hard * * *." There was, therefore, testimony that the company's safety device had not protected employees in the past and that this was probably due to faulty adjustment of the safety device. Moreover, the foreman testified that he knew of that accident.[7]

---

[7] It must be made clear that the evidence shows that foreman Miller did not work at the plant at the time of that prior accident, and therefore obviously had not adjusted the pullbacks being used by Verde Adams.

The safety device, referred to as a Possons safety device, was connected by cables to the ram and individually adjusted to each machine operator. Ordinarily, it would automatically pull the operator's hands out of the danger zone any time the ram descended. It was the employer's contention that the bolt which held the cable to the ram had somehow sheared off, which resulted in the failure of the pullback device, and injury to appellee. This explanation was countered by a number of witnesses. Two employees stated that following the accident, the foreman sent them away from the machine at issue; that they observed him return to the area of the machine and heard him beating on it with something metallic; that afterward he emerged from the area with a broken bolt, asserting that its failure had resulted in the injuries. Later, the testifying expert asserted that the bolt was over three-quarters of an inch thick and, when properly connected, would not shear off from the pressures ordinarily applied to it, but would if it were struck repeatedly. Finally, and perhaps most crucially, testimony indicated that after the ram descended onto his hand, the pullback engaged and stretched his tendons between the pinch point where his fingers were trapped and the remaining part of his hand. By their interrogatory answers, the jurors clearly did not accept the sheared bolt explanation for the injury.

From the foregoing testimony, the jurors could correctly have found that the first and part of the third elements set forth in paragraph five of the syllabus of *Van Fossen* were met. There was evidence that the employer knew that the 2/11 punch press had a tendency to repeat, for whatever reasons, and that harm could result to an employee if it did repeat. The mere fact that the machine occasionally repeated is insufficient to demonstrate intent when the employer equipped the machine with safety devices. We are left to determine whether the employer assigned appellee to the task with knowledge that by subjecting him to the "dangerous process, procedure, instrumentality or condition, then harm to the employee * * * [would] be a substantial certainty and not just a high risk."

To decide this issue, we must focus upon appellee's core contention that the injuries resulted from the failure of the foreman to properly adjust the pullback safety device. There were several witnesses who testified that the foreman customarily failed to adjust the pullback harness in accordance with those procedures set forth in the instruction manual. This was appellee's single theory to explain how his hand could remain in the danger zone while the ram descended on the repeat stroke. Thus, it is not the act of assigning appellee to the machine which would be the focal point, since there would be no expectation of harm to one wearing the pullback safety device. Instead, the mental element of this intentional tort must be found in the act of misadjusting the pullback device, or it is not to be found at all.

It might be argued at this point that the foreman knew to a substantial certainty that if the safety devices were inadequately adjusted, plaintiff's injury would be substantially certain to occur, given the foreman's knowledge of the 2/11's propensity to repeat. This, however, is too broad a statement for our purposes. Any employer, or employee, is aware that *if* a safety device fails, there is a substantial likelihood that the employee will be injured. To so construe our inquiry here would result in a transmutation of any degree of negligent act connected with the failure of a safety device into an inten-

tional tort. This would occur because knowledge of the possible consequences, even to a near certainty, is not necessarily related to the underlying act at issue which, as in this instance, was negligence and, however gross, was not an intentional tort. The focus must therefore be more precisely upon the actor's knowledge of all elements surrounding his misadjustment of the pullback devices in light of his background and available knowledge of the dangerous consequences that were substantially certain to occur in the use of this machine by this employee. We must inquire whether evidence existed that foreman Miller knew that his methods of adjustment of the pullback safety device would be inadequate and substantially certain to occasion the incident.

At the outset, it is observable that the pullback device was a safety device intended to guard against the very harm which occurred. Also, appellee's own expert conceded that these devices were fully approved by both OSHA and the Ohio Industrial Commission. As to their use, the testifying employees allowed that the foreman did make adjustments to the harness for those employees who operated the 2/11. The specific evidence in the record before us shows that foreman Miller's methods of adjusting safety harnesses, although not as recommended by the manufacturer's manual, had ordinarily been sufficient to protect other employee press operators. There was no proof that any of his adjustments had resulted in, or were connected to, a previous injury on

a punch press.[8] This is the key link in the evidence that is missing. Therefore, it cannot, as a matter of law, be inferred that Miller knew, to a substantial certainty, that what he was doing would injure this employee. At best, we observe a reckless disregard of a known safety procedure.

Consequently, the trial court was entirely justified in granting a judgment n.o.v. The interrogatories indicate that the jury was misled in its focus and, as we have concluded, there was not sufficient evidence that the employer acted with knowledge to a substantial certainty. Accordingly, I concur.

LOCHER, J., dissenting. Because I cannot agree that the trial court was justified in granting the motion for judgment n.o.v., I would affirm the decision of the court of appeals.

In considering a motion for judgment n.o.v., a court must apply the following test:

"* * * The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied." *Posin* v. *A.B.C. Motor Court Hotel* (1976), 45 Ohio St. 2d 271, 275, 74 O.O. 2d 427, 430, 344 N.E. 2d 334, 338; *Osler* v. *Lorraine* (1986), 28 Ohio St. 3d 345, 28 OBR 410, 504 N.E. 2d 19; *Nickell* v. *Gonzalez* (1985), 17 Ohio St. 3d 136, 17

---

[8] Appellee proffered some evidence to the trial court to the effect that on other occasions, this foreman had made adjustments to pullback devices on machines other than the 2/11, which had resulted in amputations. The trial court disallowed this evidence although it was crucially on point for establishing the mental state of the foreman at the time in question. We note that appellee has not raised this as an issue at any stage of the appellate proceedings. It is accordingly waived.

OBR 281, 477 N.E. 2d 1145; *Ayers v. Woodard* (1957), 166 Ohio St. 138, 1 O.O. 2d 377, 140 N.E. 2d 401, paragraph two of the syllabus. See, also, *McNees* v. *Cincinnati Street Ry. Co.* (1949), 152 Ohio St. 269, 40 O.O. 318, 89 N.E. 2d 138, paragraph two of the syllabus; and Civ. R. 50(B).

Furthermore, "[i]t is the duty of a trial court to submit an essential issue to the jury when there *is* sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on the issue * * *." (Emphasis *sic.*) *O'Day* v. *Webb* (1972), 29 Ohio St. 2d 215, 58 O.O. 2d 424, 280 N.E. 2d 896, paragraph four of the syllabus.

Construing the evidence most strongly in favor of appellee, it is clear that reasonable minds could come to different conclusions about whether appellant was substantially certain harm would occur to appellee. A jury could, and in this action did, find substantial certainty on the part of appellant from the circumstances surrounding the injury to appellee. As Justice Holmes points out, there is evidence in the record that it was widely known by company employees that the 2/11 punch press in question had a tendency to repeat, that the same press had previously injured another employee, that the sheared bolt was not the cause of the pullback restraint guards' failure, and that the pullback restraint guards would have operated satisfactorily to protect appellee but for their improper adjustment by appellant's foreman. From this and other evidence adduced at trial, reasonable minds could differ as to whether appellant was substantially certain appellee would be harmed by the press. Accordingly, the trial court should have denied appellant's motion for judgment n.o.v.

That reasonable minds can come to different conclusions in this case is evidenced by the different conclusions reached by the jury, the trial court, the court of appeals, and this court. Such disagreement demonstrates that the question of intent should be resolved by the finder of fact. See *Blankenship* v. *Cincinnati Milacron Chemicals, Inc.* (1982), 69 Ohio St. 2d 608, 621, 23 O.O. 3d 504, 513, 433 N.E. 2d 572, 581 (Locher, J., concurring in part and dissenting in part); and *Jones* v. *VIP Development Co.* (1984), 15 Ohio St. 3d 90, 101-102, 15 OBR 246, 256, 472 N.E. 2d 1046, 1056 (Locher, J., concurring in part and dissenting in part).

For these reasons, I would uphold the court of appeals' judgment reinstating the jury's verdict.

SWEENEY and DOUGLAS, JJ., concur in the foregoing dissenting opinion.

DOUGLAS, J., dissenting. This case and the votes of the individual members of this court present a graphic example of how reasonable minds, with firmly held beliefs but with no propensity to arrive at a preconceived result, can differ when viewing the same set of facts. This does not, necessarily, make any one of us pro-claimant and anti-company or pro-company and anti-claimant. Only those who seek to place labels on us, for their own purposes, come to such conclusions. What our differences do mean is that we have individually and thoroughly reviewed a record and have come to differing conclusions. Such is the case at bar.

I concur in the well-reasoned dissent of Justice Locher. In addition to the facts recited in the concurring opinion of Justice Holmes and the dissenting opinion of Justice Locher, I would add the following.

The majority opinion refers to "a former supervisor of maintenance" at

appellant company. The reference is to Lawrence Searl, who was appellant's superintendent of maintenance from 1976 to March 1977. During this period, Searl was responsible for the repair and maintenance of appellant's presses, including the 2/11 press involved in this case. Searl's largely uncontradicted testimony is pertinent because he had a full and complete knowledge of this particular press and the fact that appellant's management was fully familiar with the repeating problems of the press.

Searl testified that during his employment with appellant, he had received complaints from workers that the 2/11 press was repeating; that he constantly had problems keeping the brakes on the 2/11 in safe working condition; that the brakes would heat up after approximately two hours of operation; that when the brakes got hot, the press would repeat; and that he had advised both John Barrett, the plant manager, and Tony DiFino, the *owner* of appellant company, that the brakes on the 2/11 were unsafe. Searl testified that he had told Barrett and DiFino that the 2/11 should be equipped with air brakes and clutch and an anti-repeat system; that Searl was told to determine the cost of these improvements; that he did so and the estimated cost was between $17,000 and $19,000; that DiFino did not want to spend that much money on the 2/11; that the 2/11 was not improved or replaced; and that even though employees continued to complain that the 2/11 was repeating, no changes were made in the press.

Searl further testified that in July 1976 an employee by the name of Adams suffered the amputation of three fingers of his hand when the brakes on the 2/11 press failed and the press repeated; that Searl renewed his efforts to have appellant replace the brakes and clutch but, despite his ef-

forts, the work was never done; that Searl left his employment with appellant in March 1977; that he became employed by a press repair company and as part of that employment was sent to appellant company to repair the 2/11 press; and that he again recommended that the brakes on the 2/11 be replaced.

Subsequently, on October 23, 1978, appellee was operating the 2/11 press in appellant's plant. The jury, as gleaned from the answers to the interrogatories, found that the press repeated causing the crushing of appellee's right hand, the amputation of three fingers, the partial amputation of his index finger and multiple fractures of his thumb. Despite the continued complaints of employees that the press was repeating, the prior injury to Adams on the same press, the numerous warnings from appellant's maintenance superintendent and the knowledge of the problems by management, including the owner of the company, no changes were made to the press. On the night of appellee's injury, another employee, Paulette Krocker, was assigned to run the 2/11 press. While she was operating the press, it repeated on two occasions. She told George Miller, the foreman, that the machine had repeated. He told her: "You are crazy. It doesn't repeat." She refused to operate the press any longer. When she was assigned to another machine, she left behind, on the 2/11, a wooden stick she had been using to knock parts out of the 2/11. When Miller assigned appellee, an employee of some three weeks' duration, to run the 2/11 — a press appellee had never run before — Krocker objected, again telling Miller that the machine had repeated on her.

As appellee approached the 2/11, he saw a piece of wood on the machine.

Appellee asked Miller what the wood was for and Miller threw the wood aside, telling appellee he would not need it. This was the stick that Krocker had been using to knock parts out of the 2/11. In addition to all this, the record shows that Miller knew that another employee had lost the fingers on his right hand in 1976 while working on the 2/11.

Notwithstanding this background, appellee Pariseau was assigned to the 2/11 without any warning about the previous problems with the press. Appellee ran the 2/11 until, on the very last piece, as he reached in to catch the falling part, the press repeated and his hand, his livelihood and his very life were smashed.

Was there substantial certainty here that harm would occur? It is obvious that two court of appeals judges out of three and three justices of this court out of seven have found enough in the record to warrant upholding the jury's verdict. The jury heard the evidence, viewed the witnesses and rendered a verdict. That verdict should not be so lightly set aside. In addition, it would seem that the case fits perfectly into the three-part test referenced in the concurring opinion herein and in *Van Fossen* v. *Babcock & Wilcox Co.* (1988), 36 Ohio St. 3d 100, 522 N.E. 2d 489, paragraph five of the syllabus.

I would invite those who would deprive persons such as appellee of their right to sue for their injuries to read the record in this case. I have! Accordingly, I dissent.