OPINION
Jason Bede appeals from a judgment of the Montgomery County Court of Common Pleas, finding that Dayton Power and Light ("DPL") had not acted negligently in marking electric lines that ultimately led to injuries sustained by Bede when he incurred an electric shock during excavation work.
Bede began working for Willhoite Sons ("Willhoite") on May 28, 1997 as a seasonal employee in their fence installation business. On June 19, 1997, Willhoite supervisor Jim Cain, along with Bede and Alex Rodriguez, reported to 913 Ashcreek Drive in Washington Township, Ohio to construct a fence. Several days prior to digging, Willhoite notified the Ohio Utility Protection Service ("OUPS") of their intent to dig. OUPS contacted DPL, and locator Marv Priest went to the site and marked the approximate location of the underground electric lines. Using two pieces of locating equipment, a subsite and a receiver, Priest marked on the lawn the vicinity of the electric lines which ran underground from the pedestal in the back yard of the home to the area where the meter entered the home.
To do this, Priest attached his subsite transmitter to the neutral line of the meter. Priest used the transmitter to select a frequency on the line, and then he used a receiver, set at the same frequency as the subsite, to pick up the signal from the line buried in the yard. As he walked the approximate line between the pedestal to the meter, the receiver emitted a beep to indicate that it received the transmitted signal, and thus Priest was able to spray the ground to indicate where the electric lines were located.
Being careful of the red lines indicating the location of the electric lines, Willhoite began marking and digging the corner posts for the fence. Bede and Rodriguez began digging the holes for the posts using a two-person gas-powered auger to drill eight to ten inch holes. As Bede was drilling one of the holes, the auger suddenly began vibrating more than usual, and he experienced an "incredible pain" through his arms. Bede was unable to release his grasp on the auger. Bede eventually kicked the shaft of the auger and propelled himself away from the machine. Rodriguez turned off the auger and pulled the machine out of the hole. They discovered that the electric line leading to the house had been severed, despite the indicated markings approximately five feet away from the hole. The cable line had also been severed.
DPL was contacted and Frederick Stovall, Supervisor of Underground Locating, was sent to the site. Stovall called Priest back out to the site, along with another locator, Mark Yosik. Stovall had Yosik reevaluate the lines, and the result was slightly different from Priest's line locations. However, Yosik experienced some difficulties in completing this task.
It was later determined that a telephone line in the vicinity had caused interference with the neutral signal of the electric line, which made Priest's receiver interpret the interference as the signal from the electric line.
On June 10, 1999, Bede filed his complaint against DLL, alleging that he had sustained injuries resulting from DPL's negligence in failing to accurately locate and mark the electric line that had been hit with the auger. DPL filed its answer on July 12, 1999 and filed a motion for summary judgment on July 10, 2000. The motion addressed the issue of whether Bede was contributorily negligent in using the auger to dig in the vicinity of a utility box and whether that negligence had exceeded that of DPL's or if it had been superceding. Additionally, DPL argued that summary judgment was warranted because Bede had failed to provide an expert witness to support his negligence claim and because special damages had not been proven.
The trial court denied the motion on September 11, 2000, and the case proceeded to trial on November 13, 2000. At the close of Bede's case, DPL made a motion for a directed verdict on the issue of negligence, which the trial court denied. At the close of DPL's case, Bede moved for a directed verdict on the issue of negligence, which the trial court denied. The jury returned a verdict in favor of DPL. On December 1, 2001, the trial court filed its judgment entry in favor of DPL.
Bede filed a motion for judgment notwithstanding the verdict and a motion for a new trial on December 15, 2000. The trial court denied the motions, and Bede now appeals the trial court's rulings, asserting three assignments of error. As Bede's first and second assignments of error utilize the same standard of law, we will address these issues simultaneously.
 I. The trial court erred in its failure to grant Plaintiff-Appellant's motion for directed verdict in that reasonable minds could conclude only that Defendant was negligent in its failure to correctly locate and mark the electric line.
 II. The trial court erred in its failure to grant Plaintiff-Appellant's motion for judgment notwithstanding the verdict in that reasonable minds could conclude only that Defendant was negligent in its failure to correctly locate and mark the electric line.
Bede argues that the statute at issue, R.C. 3781.29, invokes the doctrine of negligence per se. Bede asserts that since DPL "essentially admitted" that the lines were not adequately marked, the trial court should have taken the issue of negligence out of the hands of the jury and permitted the jury to proceed on the issues of causation and damages with an instruction on negligence per se.
Under Civ.R. 50(A) and (B), the standard of review of a ruling on a motion for a directed verdict and a motion for judgment notwithstanding the verdict is the same. Posin v. A.B.C. Motor Court Hotel, Inc. (1976), 45 Ohio St.2d 271, 74 O.O.2d 427. The court set out that standard as follows:
 The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions.
See, also, Pariseau v. Wedge Products, Inc. (1988), 36 Ohio St.3d 124,127; Strother v. Hutchison (1981), 67 Ohio St.2d 282, 21 O.O.3d 177. This "reasonable minds" test calls upon a court to determine only whether there exists any evidence of substantial probative value in support of the claims of the non-moving party. Wagner v. Roche Laboratories
(1996), 77 Ohio St.3d 116, 119-120. Our review of the trial court's disposition of these motions is de novo.
Bede argues that DPL's violation of R.C. 3781.29 in failing to mark the actual location of the electric line constituted negligence per se. We note that Bede did not directly make this argument at trial. However, in his motion for a directed verdict, Bede did argue that since DPL violated the statute, the trial court should take the issue of DPL's duty and breach of that duty away from the jury; thus, we will interpret this to be an argument in support of negligence per se.
The elements of negligence are: (1) the existence of a duty; (2) breach of that duty, (3) proximate cause between the breach and some damage to the plaintiff; and (4) damage to the plaintiff. Miller v. SuperiorElectric Co. (Sept. 28, 2000), Franklin App. No. 00AP-53, unreported. "All of the elements of negligence must be demonstrated for a plaintiff to recover under a theory of negligence." Whiting v. Ohio Dept. ofMental Health (Mar. 29, 2001), Franklin App. No. 00AP-1062, unreported, following Osler v. Lorain (1986), 28 Ohio St.3d 345, 347.
The law of negligence per se has been defined as follows:
 Where a legislative enactment imposes upon any person a specific duty for the protection of others, and his neglect to perform that duty proximately results in injury to such another, he is negligent per se or as a matter of law.
 * * * Where there exists a legislative enactment commanding or prohibiting for the safety of others the doing of a specific act and there is a violation of such enactment solely by one whose duty it is to obey it, such violation constitutes negligence per se; but where there exists a legislative enactment expressing for the safety of others, in general or abstract terms, a rule of conduct, negligence per se has no application and liability must be determined by the application of the test of due care as exercised by a reasonably prudent person under the circumstances of the case.
Eisenhuth v. Moneyhon (1954), 161 Ohio St. 367, 53 O.O. 274, paragraphs two and three of the syllabus. The Ohio Supreme Court has further explained that:
 [W]here the duty prescribed by the enactment is so specific that the only determination necessary by the jury is to find but a single fact, a violation of the statute, then there is negligence per se. Conversely, if the jury must determine negligence from a consideration of several facts and circumstances, then negligence per se is inapplicable.
Hurst v. Ohio Dept. of Rehab. Corr. (1995), 72 Ohio St.3d 325, 327, citing Eisenhuth, supra, at 373-374, 53 O.O. at 277-278. Furthermore, as we stated in Zimmerman v. St. Peter's Catholic Church (1993),87 Ohio App.3d 752, 762:
 For the violation of a particular regulation, ordinance, or law to be held negligence per se, its violation must be obvious and clear. * * * If the violation has to be proved through expert testimony it is obvious that human reasoning and judgment are involved in testing the condition against the rule.
The statute at issue, R.C. 3781.29(A)(1) states, in pertinent part:
 Except as otherwise provided in division (A)(2) of this section, within forty-eight hours of receiving notice under section 3781.28 of the Revised Code, each utility shall locate and mark the approximate location of its underground utility facilities at the excavation site. If a utility does not mark its underground utility facilities or contact the excavator within forty-eight hours of receiving notice under section 3781.28 of the Revised Code, the utility is deemed to have given notice that it does not have any facilities at the excavation site. If the utility cannot accurately mark the approximate location, the utility shall mark the approximate location to the best of its ability, notify the excavator that the markings may not be accurate, and provide additional guidance to the excavator in locating the facilities as needed during the excavation.
We note that no Ohio court has ever found a violation of R.C. 3781.29
to be negligence per se. After examining the wording of the statute, we find that a violation of such would not be negligence per se. Indeed, some judgmental determination is required in ascertaining what is "approximate" and what constitutes the "best of its ability" within the section. Both clauses are not accurately defined and require a subjective analysis for determining compliance. Because some level of human judgment or decision making is necessary to comply with the code section, we find that the violation is not "obvious and clear."Zimmerman, supra, at 762. Additionally, expert testimony would be helpful, if not necessary, to conclude whether a marked location was an "approximate location." For these reasons, we find that the statute at issue does not give rise to negligence per se. Accordingly, we overrule Bede's argument that the trial court erred in failing to impose a negligence per se burden upon DPL for alleged violating R.C.3781.29(A)(1).
Likewise, we find no error in the trial court's denial of the motion for directed verdict and the motion for judgment notwithstanding the verdict on the issue of DPL's negligence. Bede presented evidence that DPL was negligent in failing to mark the location of the electric line, resulting in damages to him from the electric shock. DPL presented evidence that Priest, a locator with fourteen years of experience, utilized standard procedures in attempting to locate and mark the electric line using state of the art equipment. Due to the telephone line unknowingly creating an interference, which Priest received as a signal from the electric line on his equipment, Priest marked the line where he believed the electric line sat underground.
Based upon the above discussion, and construing the evidence in favor of DPL, we find that reasonable minds could reach different conclusions from the evidence presented. For these reasons, we find that the trial court properly denied Bede's motion for a directed verdict and motion for judgment notwithstanding the verdict.
 III. The trial court erred in its failure to grant Plaintiff-Appellant's motion for a new trial in that the jury's verdict was both against the manifest weight of the evidence and contrary to law.
According to Bede, because the trial court did not make a determination that DPL's actions constituted negligence per se, and because the trial court failed to direct a verdict against DPL for its clear failure to satisfy the requirements of R.C. 3781.29(A)(1), the jury was given the opportunity to "erroneously assess" the reasonableness of DPL's actions beyond the standard of care set in the statute. Accordingly, Bede argues that the trial court abused its discretion as the verdict was against the manifest weight of the evidence and that a new trial is warranted.
Pursuant to Civ.R. 59(A)(6), a trial court may grant a new trial where the judgment is not supported by the weight of the evidence. Pena v.Northeast Ohio Emergency Affiliates, Inc. (1995), 108 Ohio App.3d 96,103. Where the verdict is supported by "competent, substantial and apparently credible evidence," a motion for a new trial shall be denied.Verbon v. Pennese (1982), 7 Ohio App.3d 182, 183.
We will reverse the trial court's ruling on a new trial premised on the weight of the evidence only if an abuse of discretion is shown. Malonev. Courtyard By Marriott Ltd. Partnership (1996), 74 Ohio St.3d 440,448; Rohde v. Farmer (1970), 23 Ohio St.2d 82, 52 O.O.2d 376, paragraph one of the syllabus. An abuse of discretion implies more than an error of law or of judgment; it requires that the court's attitude was unreasonable, arbitrary or unconscionable. In re Jane Doe 1 (1991),57 Ohio St.3d 135, 137. In reviewing the trial court's decision on a motion for a new trial, we must view the evidence favorably to the trial court's action rather than to the original jury's verdict. Rohde,23 Ohio St.2d at 94, 52 O.O.2d at 382. "This deference to a trial court's grant of a new trial stems in part from the recognition that the trial judge is better situated than a reviewing court to pass on questions of witness credibility and the `surrounding circumstances and atmosphere of the trial.'" Malone, supra, at 448, quoting Rohde, 23 Ohio St.2d at 94, 52 O.O.2d at 382.
Bede asserts that a new trial is warranted because the verdict is against the manifest weight of the evidence. When determining whether a judgment is against the manifest weight of the evidence in a civil context, the standard of review is the same as that in the criminal context. Frederick v. Born (Aug. 21, 1996), Lorain App. No. 95CA006286, unreported. In determining whether a criminal conviction is against the manifest weight of the evidence:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175; see, also, State v. Otten
(1986), 33 Ohio App.3d 339, 340.
While Thompkins explicitly permits this court to consider credibility when confronted with an argument that the verdict is against the manifest weight of the evidence, such consideration is not unbounded. We have explained the limited role of an appellate court in reviewing issues of credibility in weight of the evidence challenges:
 Because the factfinder, be it the jury or * * * the trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion. Therefore, although this distinction is not set forth in Thompkins, supra, we conclude that a decision by a factfinder as to which testimony to credit, and to what extent, is a decision that is entitled to greater deference than the decision as to how much logical force to assign an inference suggested by that evidence — in short, how persuasive it is.
State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, unreported. Mindful of these principles, we turn to the merits of Bede's final argument.
Preliminarily, we note that, based upon our decision in the first and second assignments of error, we overruled Bede's claims that it was against the manifest weight of the evidence for the trial court to fail to find that DPL's actions constituted negligence per se. We will now evaluate whether the verdict was against the manifest weight of the evidence because DPL was negligent under R.C. 3781.29(A)(1). We find no abuse of discretion in the trial court's denial of Bede's motion for a new trial.
At trial, Priest testified that he had proceeded with locating the electric line in this case the same way he had during the previous fourteen years as a locator for DPL. Priest testified that his normal routine for locating lines was to report to the site and check the subsite equipment to ensure that the batteries were working. Priest would attach the subsite to a neutral line and select a frequency on the subsite to transmit a signal though the neutral line. He then checked the batteries on the receiver and set the frequency on the receiver to match that of the subsite.
Priest explained that, if there was a pedestal on the property, he would locate the pedestal and would walk the property from the meter to the pedestal to pick up an audible tone on the receiver. When he found the audible tone, he would mark it by painting the grass with red spray paint to indicate where the electric lines were.
Often when he would complete this "inductive" method for locating the electric line, he would then check the accuracy by using the "conductive" method. This method involved setting the receiver to hit the "sixty cycles," which is the common range for American electric lines, so that the receiver would respond at the sixty cycle frequency instead of responding to the frequency that the subsite had been programmed to transmit.
Once satisfied that he had located the line with accuracy, Priest would complete his daily log and move onto the next locating job. If Priest was not satisfied with his locating, he would spray paint a note in the grass to the contractor that the readings were not "good." In this case, there was no indication in Priest's log that he was not satisfied with the signals that he was getting from the receiver. Accordingly, Priest marked the lines and did not write in the grass that the readings were not "good."
Priest testified that this procedure was simple and very accurate. According to Priest and Stovall, Priest was the most experienced locator in the area, and the equipment he used was state of the art. Furthermore, Stovall explained that the procedure that Priest had followed to locate the line had been consistent with the locating procedures utilized by DPL and other utilities in Ohio.
According to Stovall, the problem in this instance was that DPL shared a common underground line with lines from a cable television company and a telephone company. As a result, the other lines created an interference while Priest tried to locate the electric line. After the electric line had been cut by Bede, another locator was sent to use the inductive method of locating to determine the location of the electric line, which proved to be very difficult. Stovall concluded that there was nothing to suspect that Priest would have thought that his markings were not accurate. To the contrary, Stovall later spoke with Priest and determined that Priest's procedure in locating the line at issue was consistent with DPL's policy and procedure, and consistent with the policies and procedures followed by other utilities in Ohio.
Based upon the above discussion and upon the resolution of the first and second assignments of error, we conclude that the trial court did not erroneously deny Bede's motion for a new trial on the grounds that the verdict was against the manifest weight of the evidence. As such, we overrule Bede's third assignment of error.
Accordingly, the trial court's judgment is affirmed.
BROGAN, J. and FAIN, J., concur.