OPINION
{¶ 1} Appellant, Brandon Bronson ("Bronson"), appeals the February 6, 2004 judgment entry of the Common Pleas Court of Defiance County granting summary judgment in favor of appellee, Defiance Stamping Co. ("Defiance Stamping").
 {¶ 2} On January 5, 2001, Bronson filed a complaint alleging intentional tort on the part of Defiance Stamping in the Common Pleas Court of Defiance County seeking recovery of damages for injuries he sustained as an employee of Defiance Stamping while operating a punch press. Bronson alleged that his injuries were the direct and proximate result of Defiance Stamping's deliberate, willful, wanton, reckless and intentional tortuous conduct. Bronson alleged Defiance Stamping knew that under the circumstances the punch press operated by Bronson constituted a dangerous device and that harm to Bronson was a substantial certainty. Bronson also filed a complaint against Positive Safety Manufacturing Company, the manufacturer of the safety device on the punch press, but later voluntarily dismissed the complaint without prejudice. Defiance Stamping filed an answer to Bronson's complaint and depositions of witnesses were taken.
 {¶ 3} The following relevant facts were ascertained from the record. Bronson reported for his first day of work at Defiance Stamping on February 8, 1999. Bronson reported to the plant superintendent, Dick Cline, at approximately 7:00 a.m. on that morning. Cline and Bronson met briefly in his office before Cline took Bronson into the plant to begin his training. Bronson received some training and practice on a tow motor. Bronson was then taken to a seventy-five ton Minster punch press for training. The press was equipped with a safety device commonly known as a "pullback." Cline gave Bronson instructions for the operation of the press. Bronson testified that Cline told him "to get a part from the left, put it in there, switch the press and then use the lever, take it out and put it in the different tray to the right." January 11, 2002 Brandon Bronson Depo. p. 30. The press was run using a pedal switch and both hands were used to load pieces into the press. Bronson did not receive any written materials to review or an employee handbook. Bronson testified that the only thing Cline told Bronson about safety was that the pullbacks were to keep his hands out of the press. Bronson did not receive any training regarding how to adjust the pullback device.
 {¶ 4} However, Bronson acknowledged initialing a document entitled "Pullout Adjustment Record" which was attached to the back of the pullback device Bronson used. Bronson testified he was told "to inch the press down and check it like Dick did and then sign it [the form], make sure my hands couldn't get caught in there." January 11, 2002 Brandon Bronson Depo. p. 37. Bronson testified that he was hooked up to the pullback device and Cline inched it down the press. Bronson testified that it was his understanding that the reason Cline did this was to ensure that the pullback was properly adjusted so Bronson could not get his hands caught in the press while it was in operation. Bronson testified that during this check of the pullback device "there was no possible way that [he] would be able to get [his] hands caught in the machine." January 11, 2002 Brandon Bronson Depo. p. 37.
 {¶ 5} Cline, the plant superintendent, testified he checked to ensure Bronson was hooked up to the pullback and that the pullback was properly adjusted before allowing Bronson to operate the press. Cline testified that he showed Bronson how the seventy-five ton Minster press operated and "showed him how to put on his motion guards, the hand straps, then I inched down so that the die was two inches from the nearest pinch point from him, checked his guards to make sure his hands couldn't be in it." October 3, 2002 Richard Cline Depo. p. 10. While Cline did not specifically explain to Bronson what to do if a part got stuck in the press, he did tell Bronson to seek the assistance of a maintenance employee who was working in the area if he had any problems.
 {¶ 6} After Cline had demonstrated the operation of the press to Bronson and watched Bronson run parts through the press for approximately fifteen minutes, Cline left Bronson to operate the press on his own. Bronson testified that he was not told how many parts he was expected to run and did not receive pressure from anyone at Defiance Stamping to work at a fast pace. After approximately forty-five minutes of operating the press, Bronson's left hand was caught between the die and the part. Bronson started yelling and his father, Harold Bronson, the head of maintenance, came over to the machine. The die remained pressed against Bronson's hand until Harold Bronson reversed the movement of the die with his key. Bronson's hand was severely injured and he suffered a loss of fingers on that hand
 {¶ 7} Defiance Stamping made the determination that Bronson was injured while attempting to retrieve a bent part from the die and accidentally activating the foot pedal on the press. Although Bronson could not recall exactly what happened to cause his injury, he believed he was injured as he was putting a part in the press and not in an attempt to fix a part that had been put in wrong. Bronson did admit that he had accidentally pushed the foot petal to run the press while his hand was under the die.
 {¶ 8} It is undisputed in the record that Bronson was wearing the pullback safety harness at the time of his injury and that the safety device failed to function properly. Stanley Holbrook, a maintenance employee at Defiance Stamping, did the set-up and the maintenance check on the press on which Bronson was injured. Holbrook testified that he checked the pullback device on February 5, 1999 by pulling on it to see if he could get close to the die and see if there was any give with the device. Holbrook testified that he believed he had correctly set-up the die on the press and that he did not notice anything wrong with the pullback device when he checked it. Holbrook did acknowledge observing that the frame of the pullback device was bent after Bronson's injury, although Holbrook was not aware of the condition of the frame when he did the maintenance check on the press.
 {¶ 9} Harold Bronson, maintenance supervisor, was one of the persons to inspect the press after the accident occurred. Harold looked at the tickets filled out for the maintenance on the machines and found that Stanley Holbrook was the maintenance employee who set the die for the press and adjusted the pullback device. Harold testified that he looked at the press and "it looked like it was set right" by Stan Holbrook. May 28, 2002 Harold Bronson Depo. p. 20. Harold testified that the first time he observed that the pullback device was loose on the press was after Bronson's accident. Harold stated the rivet that holds the arms of the pullback device to the pole was "showing wear" although "you probably wouldn't see the wear." May 28, 2002 Harold Bronson Depo. p. 32. The testimony showed that when the pole of the pullback device is loose there is greater variance.
 {¶ 10} Frederick Tomazic, vice-president of Positive Safety Manufacturing, the company which manufactured the pullback device on which Bronson was injured, responded to the request of Brian Callan, vice-president of Defiance Stamping, to come to Defiance Stamping to investigate the accident. Through his investigation, Tomazic discovered that the base of the pullback device was loose, which allowed the cords to move to the left and right sides two and a half inches more than they should. Tomazic determined that a hole in the brace was worn and the pin used to secure the mechanism was undersized, allowing it to rotate. Tomazic testified that employees at Defiance Stamping believed the pullback device became loose as a result of the accident and did not appear to be aware that the device was loose prior to the accident. Tomazic testified that it would not be obvious to the naked eye that the pullback device was loose.
 {¶ 11} Tomazic also discovered that the column of the pullback device was bent. Tomazic testified that Cline told him that pullback devices at Defiance Stamping had been hit with forklifts and that it happened often. Tomazic determined that the pullback device became loose prior to the accident that occurred on February 8, 1999. Tomazic also determined that pulling on the cords of the pullback device could not make the pullback become loose. Tomazic believed that a forklift collision with the pullback device could have caused it to be bent.
 {¶ 12} The press on which Bronson was injured had been installed at Defiance Stamping in 1954. Defiance Stamping was unaware of any accidents that occurred while using the press that resulted from a failure of the pullback safety device. There was no evidence presented that Defiance Stamping was aware, prior to the accident, of any malfunction of the pullback safety device. The investigation conducted after the accident revealed that the pullback frame was unstable and a loose or worn rivet permitted swiveling which could cause a failure of the safety device. While employees of Defiance Stamping acknowledged that there had been forklift collisions with pullback frames, there was no evidence presented of any knowledge that the safety device at issue in the case had been struck by a forklift. Further, the testimony in the record indicated that any damage to pullback frames as a result of forklift collisions was, as a matter of course, promptly repaired when brought to the attention of a supervisor or maintenance employee of Defiance Stamping. There was no evidence presented that any employee of Defiance Stamping knew prior to the instant accident that the safety device in question had been damaged or was unsafe in any manner.
 {¶ 13} Defiance Stamping filed a motion for summary judgment on October 31, 2002. Bronson filed a brief in opposition to the motion. The trial court granted summary judgment in favor of Defiance Stamping on February 6, 2004, finding that Bronson failed to demonstrate knowledge of Defiance Stamping of a dangerous condition in its business operation. The trial court further found that even if there was knowledge on the part of Defiance Stamping, the record did not support the conclusion that Defiance Stamping knew with substantial certainty that Bronson would be injured. Finally, the trial court found that in the absence of such knowledge by Defiance Stamping, it could not be established that Bronson was required to perform a dangerous task in the face of such knowledge. It is from this judgment that Bronson now appeals, asserting the following assignment of error.
Appellee's motion for summary judgment was improperly granted by thelower court for the reason that the record contains issues of fact oneach element of appellant's intentional tort claim.
 {¶ 14} We begin by noting that the standard for review of a grant of summary judgment is one of de novo review. Lorain Nat'l Bank v. SaratogaApts. (1989), 61 Ohio App.3d 127, 129, 572 N.E.2d 198. Thus, such a grant will be affirmed only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). In addition, "summary judgment shall not be rendered unless it appears * * * that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence construed most strongly in his favor." Id.
 {¶ 15} The moving party may make his motion for summary judgment in his favor "with or without supporting affidavits[.]" Civ.R. 56(B). However, "[a] party seeking summary judgment must specifically delineate the basis upon which summary judgment is sought in order to allow the opposing party a meaningful opportunity to respond." Mitseff v. Wheeler
(1988), 38 Ohio St.3d 112, syllabus, 526 N.E.2d 798. Summary judgment should be granted with caution, with a court construing all evidence and deciding any doubt in favor of the nonmovant. Murphy v. Reynoldsburg,65 Ohio St.3d 356, 360, 1992-Ohio-95, 604 N.E.2d 138. Once the moving party demonstrates that he is entitled to summary judgment, the burden then shifts to the non-moving party to show why summary judgment in favor of the moving party should not be granted. See Civ.R. 56(E). In fact, "[i]f he does not so respond, summary judgment, if appropriate, shall be entered against him." Id.
 {¶ 16} In his sole assignment of error, Bronson argues that the record provides evidence that there are issues of fact regarding the intentional tort action that should have been presented to the jury. The Ohio Supreme Court in Fyffe v. Jeno's Inc. (1991), 59 Ohio St.3d 115, paragraph one of the syllabus, 570 N.E.2d 1108, set forth the following standard by which intentional tort claims should be evaluated:
in order to establish "intent" for the purpose of proving the existenceof an intentional tort committed by an employer against his employee, thefollowing must be demonstrated: (1) knowledge by the employer of theexistence of a dangerous process, procedure, instrumentality or conditionwithin its business operation; (2) knowledge by the employer that if theemployee is subjected by his employment to such dangerous process,procedure, instrumentality or condition, then harm to the employee will bea substantial certainty; and (3) that the employer, under suchcircumstances, and with such knowledge, did act to require the employeeto continue to perform the dangerous task.
 {¶ 17} In order to withstand a motion for summary judgment, Bronson must set forth specific facts that raise a genuine issue of material fact as to each element of the Fyffe three-prong test. Fyffe,59 Ohio St.3d at 119, citing Van Fossen v. Babcock Wilcox Co. (1988), 36 Ohio St.3d 100, paragraph seven of the syllabus, 522 N.E.2d 489. "In determining whether such genuine issues have been set forth for purposes of the motion for summary judgment pursuant to Civ.R. 56, we look at the facts presented by the parties upon the motion for summary judgment." Fyffe,59 Ohio St.3d at 119.
 {¶ 18} First, there is no evidence that Defiance Stamping had knowledge of the existence of a dangerous process, procedure, instrumentality or condition within its business operation. Defiance Stamping did not have reason to believe Bronson would likely be injured while operating the press when he was wearing the pullback safety harness. There was no evidence presented that anyone at Defiance Stamping was aware that the pullback safety device attached to the press Bronson was operating was loose prior to the accident. In fact, both Cline and Holbrook tested the subject pullback safety device prior to Bronson's operation of the press. The safety mechanism of the press did not allow hands to get caught in the press at that time. Therefore, Defiance Stamping's knowledge prior to Bronson's accident was that the safety mechanism on the press was working properly.
 {¶ 19} Defiance Stamping only became aware that the pullback safety device was loose when the press was examined after Bronson's injury. In determining how the pullback safety device became loose or bent, employees of Defiance Stamping speculated that the frame of the safety device may have been hit with a forklift. However, there is no testimony in the record as to any person having knowledge that the particular pullback safety device that Bronson used had been hit by a forklift. While there is testimony in the record that pullback safety devices had been struck with forklifts in the past, the testimony also revealed that the damage to the devices was repaired when it was brought to the attention of a supervisor or maintenance employee. As these facts are not disputed in the record, the evidence shows there is no genuine issue of fact with respect to Defiance Stamping's knowledge of a dangerous process, procedure, instrumentality or condition within its business.
 {¶ 20} The evidence in the record also shows that Defiance Stamping did not have knowledge of a substantial certainty that Bronson would be injured by operating the press. In establishing an intentional tort of an employer, "proof beyond that required to prove negligence and beyond that to prove recklessness must be established." Fyffe, 59 Ohio St.3d at paragraph two of the syllabus. "Mere knowledge and appreciation of a risk" is not enough to satisfy the mental state of substantial certainty. Id. Rather, to meet the burden of proof regarding this second element of an intentional tort, Bronson was required to demonstrate that Defiance Stamping had "actual knowledge of the exact dangers which ultimately caused injury." Sanek v. Duracote Corp. (1989), 43 Ohio St.3d 169, 172,539 N.E.2d 1114.
 {¶ 21} The case of Pariseau v. Wedge Products, Inc. (1988),36 Ohio St.3d 124, 522 N.E.2d 511, is factually similar to the case sub judice. In Pariseau, the appellee worked at a manufacturing company operating punch presses. Id. After appellee had worked at the company for three weeks, he began operating a press referred to as the "2/11." Id. Appellee was instructed on how to operate the press and the use of the pullback restraint guards. Id. After approximately one hour of operating the press, appellee's hand was injured by the descending ram when his pullback restraint guard failed. Id. The evidence presented at trial was disputed with regard to whether the ram had a history of "repeating" and whether the pullback restraint guards were properly adjusted. Id. at 125. The jury found in favor of the appellee. Id. The trial court then granted appellant's motion for a judgment notwithstanding the verdict.
 {¶ 22} The Ohio Supreme Court found that the trial court had properly ordered a judgment notwithstanding the verdict, stating:
to establish that an employer has committed an intentional tort againstan employee so as to allow the employee to recover damages, aplaintiff-employee must demonstrate by a preponderance of the evidencethat the employer or his agent manifested an intent to injure theemployee and this intent includes the knowledge and expectation that suchan injury is substantially certain to occur.
Id. at 129. The Ohio Supreme Court found that the record in the case did not "contain even the suggestion that appellant's foreman intended to injure appellee or that appellee's superior placed him in a deadly or extremely dangerous working environment with the foreknowledge that he would be killed or injured." Id. at 126. Rather, the court found that the record reflected only an inference of negligence. Id.
 {¶ 23} A number of courts in Ohio "have found that prior similar incidents are probative of whether an employer knows a dangerous process or condition is substantially certain to cause injury." Cox v. BarspliceProducts, Inc. (June 15, 2001), 2d Dist. No. 2001-CA-1, unreported, 2001 WL 669336, at *4. These courts also agree that knowledge of prior incidents is not dispositive of the issue of whether the employer knew that injury was substantially certain to occur. Id. However, the fact that there were no prior injuries similar to that of a plaintiff is not dispositive of the issue of substantial certainty either. This court has held that "although the employer must have some notice that harm would be substantially certain, `notice need not take the form of a pervious workplace incident.'" Miller v. Trafzer, 150 Ohio App.3d 695,2002-Ohio-6800, 782 N.E.2d 1200, at ¶ 13, citing Gibson v. DrainageProducts, Inc., 3d Dist. No. 11-99-14, 2002-Ohio-6258, at ¶ 17.
 {¶ 24} In the case of Cox v. Barsplice Products, Inc., 2001 WL 669336, appellant, an employee at the manufacturing company, was asked to finish an order on a Landis threader. Appellant was advised that the threader was too loose and that he would have to apply pressure to the end of the rebar while turning the feed wheel in order to get a deeper cut. Id. A few days prior to operating the machine himself, appellant had assisted another employee on the machine by applying pressure to the end of a rebar. Id. While appellant was feeding pieces of rebar into the machine on the day of the incident, the rebar began spinning as it was fed into the machine. Id. Appellant continued to push the piece into the machine with his right hand, as he had been directed to do, and his right glove got caught in the spinning wheel, amputating three of his fingers. Id.
 {¶ 25} Supervisors at Barsplice were aware that a rebar placed in the Landis threader would occasionally spin and had knowledge of a prior incident where an employee injured his hand in a manner similar to appellant's injury. Id. However, the court found that knowledge of this prior injury was not sufficient to create a genuine issue of material fact that Barsplice was substantially certain appellant would be injured while operating the Landis threader. Id. The court compared the facts in the case to the situation in the Pariseau case. Id.
 {¶ 26} In the case sub judice, Defiance Stamping had knowledge of only two injuries during its entire years of operation which occurred while an employee was operating a press. The record shows that the cause was known for only one of the injuries on the press, which involved a press operator removing his safety pullback harness in order to reach a part. No evidence was presented to show that Defiance Stamping knew of any injury occurring to a press operator who was wearing his safety pullback harness or occurring on a press as a result of a loose brace. These prior injuries are not sufficient to create a genuine issue of material fact that Defiance Stamping was substantially certain Bronson would be injured while operating the press.
 {¶ 27} Supervisors at Defiance Stamping were aware that forklifts, on occasion, hit the frames of the pullback safety devices. They were also aware that damage to the devices could affect the performance of the pullback system, which could result in an employee's hand not being pulled away from a descending die on the press. These facts make this case similar to both the Pariseau and Cox cases, in which the courts found the facts sufficient to find the employers were negligent or even possibly reckless, but not liable for intentional torts. Cox, 2001 WL 669335, at *5.
 {¶ 28} No evidence was offered that Defiance Stamping knew of any damage that had occurred to the frame of the pullback safety device of the subject press by any forklift collisions. Nor was there any evidence that any employee of Defiance Stamping had been injured as a result of a malfunction of the pullback safety device. However, even if the evidence showed that Defiance Stamping had knowledge that the braces of the pullback safety device became loose at times or that the frames were occasionally bent when struck by forklifts, this would only show negligence or recklessness on the part of Defiance Stamping, and not substantial certainty of an injuring occurring.
 {¶ 29} Last, the evidence in the record shows that Defiance Stamping did not require Bronson to perform any dangerous task of which it had knowledge. The duties that Defiance Stamping required of Bronson did not involve operating the press in such a manner that an existing dangerous condition would cause injury to Bronson. Bronson's supervisor, Cline, observed Bronson operate the press before he let Bronson operate the press alone. Cline checked the operation of the press to ensure that both the press and the safety mechanism were operating properly. Further, Cline instructed Bronson to seek help if problems occurred, such as a part becoming stuck in the press.
 {¶ 30} Despite the instructions given to Bronson, the evidence shows that the cause of the injury likely resulted from Bronson reaching into the press to move a misplaced part. This evidence tends to prove that the injury might have been avoided had Bronson heeded the advice of Defiance Stamping to find a maintenance employee to assist with removing a part stuck in the press. Therefore, the evidence does not support a finding that Defiance Stamping required Bronson to perform a dangerous task in operating the press.
 {¶ 31} Construing the evidence most favorably to Bronson and applying the Fyffe standards, summary judgment in favor of Defiance Stamping is appropriate. Accordingly, Bronson's assignment of error is overruled and the judgment of the Common Pleas Court of Defiance County is affirmed.
Judgment affirmed.
Shaw, P.J. and Rogers, J., concur.