[Cite as *Teeter v. Ball Jar Corp.*, 2020-Ohio-6997.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| GARY TEETER, DBA, IMAGE INCORPORATED | : | JUDGES: |
| | : | Hon. W. Scott Gwin, P.J. |
| | : | Hon. Craig R. Baldwin, J. |
| Plaintiff-Appellant | : | Hon. Earle E. Wise, J. |
| | : | |
| -vs- | : | Case No. 2020 CA 00017 |
| | : | |
| BALL JAR CORPORATION | : | |
| | : | OPINION |
| Defendant-Appellee | | |

CHARACTER OF PROCEEDING:      Civil appeal from the Stark County Court of Common Pleas, Case No. 2018CV00580

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      December 31, 2020

APPEARANCES:

For Plaintiff-Appellant

JAMES F. MATHEWS
JACOB E. REED
400 South Main Street
North Canton, OH  44720

For Defendant-Appellee

PETER W. HAHN
ERIC B. KJELLANDER
41 South High Street, Ste. 2600
Columbus, OH 43215-6164

*Gwin, P.J.*

{¶1} Appellant appeals the October 17, 2019 jury verdict, the October 18, 2019 judgment entry of the Stark County Court of Common Pleas entering judgment on the verdict, and the December 19, 2019 judgment entry denying appellant's motion for judgment notwithstanding the verdict.

*Facts & Procedural History*

{¶2} Appellant Gary Teeter, dba Image Incorporated, owns real estate on the south side of Millerton Road in Canton. Appellee Ball Jar Corporation owns real estate on the north side of Millerton Road, on which there is a manufacturing facility to manufacture containers. Millerton Road runs parallel to appellant's property. Appellee's property is directly across the street. In 2015, appellee hired a contractor to expand the manufacturing facility. The contractor designed a basin to hold and control the water runoff from appellee's property. The City of Canton recommended and approved the basin's location and design, and the basin was constructed in accordance with this approval. The water in the basin is released into a ditch running alongside Millerton Road. The Ohio EPA sets the rate at which the water is released from the basin. An older drainage pipe (culvert) runs under Millerton Road and discharges water from the ditch on the north side of the street into a grassy swell or waterway running through appellant's property on the south side of the street.

{¶3} On March 16, 2018, appellant filed a nuisance complaint against appellee, averring that more water enters his property than before. Further, that appellant was damaged by the increase in water because the value of his property decreased.

{¶4} A jury trial was held on appellant's complaint from October 15th through October 17th of 2019. Appellant testified the property in question, located at 2064 Central Avenue, in Canton, Ohio, is titled in the name of Image, Incorporated, a company in which appellant is the 100% shareholder. Appellant is a real estate developer who bought the property as an investment in October of 2010. He purchased the property at auction in three different parcels (a total of 164 acres) for an approximate total of $930,000. He currently farms the property several times per year with crops of soybeans, corn, and hay.

{¶5} There is a grass waterway on his property that is approximately 1,320 feet long. Prior to appellee's improvements, appellant could mow and drive through the waterway, although it would sometimes be damp if it rained for several days. He was able to farm through the waterway. Appellant planted hay in the waterway, yielding approximately thirty hay bales per year. Appellant did not personally farm or sell the hay, but had an agreement with his neighbor so the neighbor used the hay for his cattle. Appellant testified his fields post-construction are now in a constant state of sogginess and he observed the water from appellee's basin coming directly on his property.

{¶6} Appellant stated that, prior to 2016, there was a "high wall" of trees and grass on appellee's property that blocked the water from coming onto his property. In fall of 2016, after appellee's construction, appellant noticed an increase of water on his property. The waterway on the property now floods when it rains because water "gushes" through it. Appellant testified when the water comes out of the 18-inch pipe coming from Millerton Road after a rain, it blows through the culvert and there is a constant trickle of water coming from appellee's pipe several days after the rain subsides. Appellant believes this is from the water appellee ran to the pond post-development, because the

water is now directed towards his property. Appellant testified he believes the basin appellee placed on the property was not supposed to stay full all the time.

{¶7} After 2016, appellant made repairs to his property, hiring a contractor to dig a ditch so the water would be confined to one area of his property. However, this did not fix the problem. Appellant cannot grow anything in the waterway; however, he farms the remainder of the land by driving around the ten acres that are too wet to grow crops. Appellant has had to change his farming techniques due to water on the property. Appellant believes the entirety of the property, with the improvements he put in, is now worth $750,000 to $900,000.

{¶8} On cross-examination, appellant stated that, prior to construction, there was water that came off the road onto his property, but it was a reasonable amount. Appellant admitted that, at one point, he went onto appellee's property and plugged the basin drain.

{¶9} Appellant confirmed that he testified at his deposition that he recently had the property appraised (post-construction), and the appraiser valued it at over $1,000,000. However, at trial, appellant stated the property has lost in excess of $240,000 in value post-construction.

{¶10} William McCullough ("McCullough") is a civil engineer who prepared a preliminary report for appellant about the stormwater situation on his property. McCullough first looked at the property in November of 2018, and reviewed the construction and design documents. McCullough testified about his report. Appellee's property has two primary drainage areas, one flowing northwest, and one flowing south, towards appellant's property. McCullough opined that, prior to construction, 5.5 acres of

surface water flow was going to appellant's property; post-construction, 12.76 acres of surface water flow is now going to appellant's property, an increase of 7.2 acres.

{¶11}   On cross-examination, McCullough testified the discharge mechanism in the basin is supposed to control the amount of flow that comes out of the basin. McCullough testified the water coming into the ditch from the north side of Millerton Road also includes water coming from adjacent properties to appellee's property.

{¶12}   At the time McCullough completed his report and gave his deposition, he had not performed an investigation into the groundwater.  McCullough agreed that in order to perform an analysis of whether the draining system is functioning properly, he would need to understand how much water was leaving appellee's property prior to construction.  At the time he completed his report, he did not perform an investigation of how much water was leaving the property prior to construction, but checked the owners' design calculations.

{¶13}   McCullough agreed that the primary purpose of a basin is to control stormwater runoff and that prior to the basin installation, the water ran down the hill toward appellant's property.  McCullough also agreed a storm sewer system and basin is a reasonable practice to manage stormwater runoff and as long as the drainage comes out of the basin at the same rate as it did pre-development, he would have no issue with the basin.  There was confusion in some of the documents McCullough reviewed as to whether the basin on appellee's property was supposed to be a retention basin (wet) or a detention basin (dry).

{¶14}   On re-direct, McCullough stated it appears from the design that not all the water goes into the basin.  While a large part of the water goes into the basin, there is a

series of catch basins and pipes that bypass the basin; they run along the driveway and go directly to Millerton Road. McCullough does not believe the engineer took this additional amount into account in his calculations.

{¶15} Steven Hersher ("Hersher") is the plant manager of the Ball facility, overseeing the day-to-day operations. The purpose of the construction project was to increase the size of the existing plant in order to make the plant the central supply plant for Ball Metalpack. The company hired 72 hourly and salaried employees post-construction. Hersher believes appellee spent approximately $1,000,000 on the basin and storm sewer.

{¶16} Hersher walks the property regularly. After a heavy rain, he has seen a steady amount of water in the basin. Since the water is discharging out of a small, three-inch pipe, there is not enough pressure in there for water to be blasting out of the pipe as appellant suggests. Hersher saw that appellant dug a trench on his property, creating a river bed that allows the water to travel through the property. Hersher viewed both properties several days prior to trial, and noted both properties, including the swell on appellant's land, were dry and the water level in the basin was below the discharge pipe.

{¶17} At one point, Hersher noticed after a heavy rain that the basin was not discharging. The engineering manager reported to Hersher that someone placed a small rubber ball into the discharge pipe. Appellant did not have permission to plug the drain. Once the ball was removed, the basin drained properly.

{¶18} On cross-examination, Hersher described the natural conditions that existed on the property prior to construction as dirt and trees that were approximately twenty feet high. Hersher confirmed that appellee graded down a portion of the land that

used to be dirt and trees to construct a driveway to the plant off Millerton Road. The first several feet of the driveway are concrete, and the remainder is asphalt, which is impervious to water. A series of catch basins or storm drains were installed during construction around the building and driveway that drain to the basin. Hersher stated water collected to the northeast of the driveway does not go through the basin, but goes directly to the culvert.

{¶19} On re-direct, Hersher confirmed that, prior to construction, there was nothing to stop the water on the southern end of the property other than dirt or trees. During his years as plant manager, Hersher has never seen water rushing down the driveway over Millerton Road and onto appellant's property.

{¶20} William Sliwinski ("Sliwinski") is a civil engineer employed by Campbell Construction, who was in charge of stormwater management on the Ball construction project. He designed and prepared the stormwater plan that is required by the city. The plan requires that the post-development stormwater levels be held to the pre-development level, based upon the flow rate (gallons per minute or cubic foot per second). Sliwinski designed the basin, or pond, in order to hold back the volume of water and meter it out at a rate that does not exceed the pre-development level. Even during a heavy rain, the amount of water coming out of the basin is controlled by the outlet pipe. In this case, the outlet pipe is three inches in diameter.

{¶21} Sliwinksi testified he chose a discharge rate less than the pre-development rate, and appellee is metering out 27% of what they could meter out pursuant to regulations. Sliwinski stated that, with development, there is always going to be more water because it cannot soak into the ground. Simply because there is more volume

does not mean the system is improper or insufficient; the basin catches any increased water and meters it out in a controlled fashion. There is some water diverted around the basin, but this is off-site water. Sliwinski testified there is no need to detain this water into the basin because it flows into the ditch on the north side of Millerton Road. Sliwinski originally thought about draining the basin to the north, but the City of Canton told him it had to drain to the south. Sliwinski made the change because, in order to get their approval, he had to do what the city wanted. The plan received approval from the City of Canton and Stark County Soil and Water Conservation.

{¶22} Sliwinski does not believe the water from the basin could constantly soak a 1,300-foot stretch on appellant's property because the water comes out of a three-inch pipe and is a trickle of water that would run for several days after a storm. The last time Sliwinski saw the swell on appellant's property, it was dry and there was vegetation in the waterway, except for approximately two feet at the end.

{¶23} On cross-examination, Sliwinski testified he did not know there was a high wall of dirt on appellee's property. It was not on the topography of the land prior to construction. He did know there were little hills approximately five feet tall where dirt bikes frequently rode. He confirmed some of the water on appellee's property does not go into the basin, but is diverted to the ditch on the north side of Millerton Road via a storm system. To his knowledge, the off-site water always was diverted to the ditch pre-development. Pre-development, the water reached the ditch via natural flow, and now the water reaches the ditch via a storm sewer system; the route is different, but the water ends up at the same location. Sliwinski testified the volume of water always increase with

any development, but there are no regulations as to volume of water; rather, the regulations address flow.

{¶24} On re-direct, Sliwinski confirmed the water not going into the basin was existing water, not new water. Any new water is routed into the basin. The old, or existing water, went into the ditch both pre-development and post-development.

{¶25} Christopher Barnes ("Barnes") is an engineer for the City of Canton who reviews and approves stormwater management plans. Barnes testified that, when designing a detention process, the designer does consider volume when determining the size of the basin, but the focus in regulations is primarily on the peak flow rate discharging from a site. Barnes stated appellee's stormwater management plan met the requirements under the code and exceeded the statutory requirements. The plan on appellee's property is designed to control the 100-year runoff (runoff from a storm that occurs every hundred years) as required by the City of Canton. According to Barnes, the terms detention and retention basin are generally used in the industry interchangeably, but the definitions provide a detention basin is a dry basin, whereas a retention basin is a wet basin. The basin on appellee's property is designed to be a wet basin, holding a permanent pool of water in order to control flooding.

{¶26} Barnes testified his calculations are that nine acres flowed south pre-development. These nine acres were made up of a portion of the Ball property, the property immediately to the east of the Ball property, and a little bit of the property west of the Ball property. After construction, more acreage drained south. However, in Barnes' opinion, this is not an issue, because the basin is designed to accommodate the difference. While the acreage determination is important, it is just a starting point; the

next step is to determine what to do with the extra acreage. Barnes stated appellee's stormwater plans were very conservative and they did everything they needed to do, from the City's perspective.

{¶27} Barnes has been to the property several times. In July, Barnes noticed a small spring near the driveway on Ball's property. When he went to look at appellant's property, he saw a small, steady trickle of water coming out of the culvert. The swell was not soggy or flooded. When Barnes last visited the site approximately a month before trial, the spring had dried itself up and the swell on appellant's property was dry as far as Barnes could see and there was no water coming out of the culvert. Barnes believes the stormwater management plan designed by appellee's contractor was reasonable.

{¶28} Barnes testified the majority of the water in the developed area is designed to go into the basin. In the undeveloped portion of the property, it is still grass as it was pre-development, and thus there is no impact or additional water that goes into the storm sewer from the developed portion of the land.

{¶29} Matthew Schroeder ("Schroeder") is an environmental engineer specializing in stormwater permitting retained as an expert by appellee to evaluate whether Ball's expansion of the property and installing the stormwater control system they did was reasonable. Schroeder first visited the site in January of 2019. It had rained about an inch the day before, so there was water flowing in and out of the basin. There was also water coming out of the culvert, approximately two inches flowing in the bottom of the pipe. He did not see any ponding or flooding on either property. Schroeder last visited the site the Wednesday prior to trial. There were dry conditions, there was no water

flowing either in or out of the basin, and there was no water flowing out of the culvert. It was dry within appellant's swell and it was heavily vegetated.

{¶30} Schroeder described the series of catch basins added as part of the development. Previously, the water went over the land, flowing south over a hill, into the ditch, and then into the culvert. While some of the water may infiltrate into the land, most of the surface water pre-development followed the path into the ditch. Schroeder did not see a high wall that went across a large portion of the Ball property pre-development, but did note two hills with a valley in between on a small part of the property. Appellee shifted a portion of the hill during development; however, the slope is the same. Schroeder testified that while the development affects flow somewhat, ultimately, the water ends up at the same place as it did pre-development.

{¶31} Schroeder disputed appellant's assertion that the water pre-development ran to the north off of Ball's property. Schroeder concluded in his report that Ball's use of the property and construction of the storm sewer system was reasonable and Ball's system minimizes any adverse impact to appellant's property.

{¶32} On cross-examination, Schroeder confirmed the area by the driveway pre-development consisted of a natural area with grass and trees. His report provides that 12.8 acres flow into the basin and 11.2 acres do not go through the basin. However, ten of the 11.2 acres are not from appellee's property, but is from adjoining properties. Additionally, even water that seeps into the ground, instead of hitting a concrete driveway, will eventually go southward into the ditch.

{¶33} Michael Sklash ("Sklash") is a senior hydrogeologist, specializing in groundwater. In his opinion, the reason why the swell is wet at times is the topographic

setting. Further, regardless of whether the basin is there or not, groundwater would naturally be flowing from the north side of Millerton Road to the south side. When Sklash visited the site on January 24, 2019, he saw groundwater discharging onto the surface north of Millerton Road, and saw water flowing in the ditches on the north side of Millerton Road towards the culvert. He dug a hole and determined the groundwater is very close to the surface near the basin. Sklash does not believe the construction had a large effect on the groundwater drainage. Rather, any increase in groundwater was a regional increase, specifically the nearby Nimishillen Creek. Sklash testified that since appellant bought his farm in 2010, the groundwater has risen about two feet, which Sklash believes accounts for why the area appellant used to be able to farm is now sometimes wet. Sklash described excavation work appellant performed on the swell in 2012 and 2018 that would also have accelerated the flow of groundwater to the swell.

{¶34} On cross-examination, Sklash stated he never met with appellant or walked on appellant's property.

{¶35} The jury found in favor of appellee. In an interrogatory, the jury found appellant did not prove, by a preponderance of the evidence, that appellee's design and construction of the drainage system was unreasonable. The trial court entered judgment on the verdict on October 18, 2019.

{¶36} Appellant filed a motion for judgment notwithstanding the verdict on November 15, 2019. Appellee filed a memorandum in opposition on December 2, 2019. The trial court denied the motion on December 19, 2019.

{¶37} Appellant appeals the judgment entries of the Stark County Court of Common Pleas and assigns the following as error:

**{¶38}** "I. THE TRIAL COURT ERRED BECAUSE THE JURY VERDICT BELOW WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE:  APPELLEE BALL JAR CORPORATION'S PURPOSEFUL DIVERSION OF SURFACE WATER AT INCREASED VOLUMES ONTO APPELLANT'S PROPERTY IS NOT A REASONABLE USE OF THE SURFACE WATER.

**{¶39}** II. THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT:  THE REASONABLE USE DOCTRINE SHOULD BE LIMITED AS A MATTER OF LAW."

I.

**{¶40}** In his first assignment of error, appellant argues the jury verdict was against the manifest weight of the evidence.

**{¶41}** In *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, the Ohio Supreme Court clarified the standard of review appellate courts should apply when assessing the manifest weight of the evidence in a civil case.  The Supreme Court held the standard of review for manifest weight of the evidence for criminal cases stated in *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997) is also applicable in civil cases.  *Id.*  A reviewing court is to examine the entire record, and determine "whether in resolving conflicts in evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered."  *Sheet Metal Workers Local Union No. 33 v. Sutton*, 5th Dist. Stark No. 2011 CA 0262, 2012-Ohio-3549.  "In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, rather than beyond a reasonable doubt, evidence must still exist on each element (sufficiency) and the evidence on each element

must satisfy the burden of persuasion (weight). *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517.

{¶42} As an appellate court, we are not factfinders; we neither weigh the evidence nor judge the credibility of the witnesses. *Markel v. Wright*, 5th Dist. Coshocton No. 2013CA0004, 2013-Ohio-5274. Our role is to determine whether there is relevant, competent and credible evidence upon which the factfinder could base their judgment. *Cross Truck v. Jeffries*, 5th Dist. Stark No. CA-5758, 1982 WL 2911 (Feb. 10, 1982).

{¶43} The underlying rationale for giving deference to the findings of the factfinder rests with the knowledge that the fact finder is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Id.* Accordingly, a factfinder may believe all, part, or none of the testimony of any witness who appears before it. *Rogers v. Hill*, 124 Ohio App.3d 468, 706 N.E.2d 438 (4th Dist. 1998).

{¶44} The Ohio Supreme Court has adopted a reasonable-use rule that is to be applied when resolving surface water disputes. *McGlashan v. Spade Rockledge Terrace Condo. Dev. Corp.*, 62 Ohio St.2d 55, 402 N.E.2d 1196 (1980). The reasonable use rule provides as follows:

> A possessor of land is not unqualifiedly privileged to deal with surface water as he pleases, nor is he absolutely prohibited from interfering with the natural flow of surface waters to the detriment of others. Each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes some harm to others.

He incurs liability only when his harmful interference with the flow of surface water is unreasonable. *Id.*

{¶45} In surface water disputes, the plaintiff bears the burden of proving the defendant's acts were unreasonable. *Id.* The question of reasonableness of the use "must be determined as a question of fact under all the attendant circumstances." *Id.* The trier of fact should determine reasonableness "by balancing the gravity of the harm caused by the interference against the utility of the interferer's conduct." *Id.*

{¶46} The Supreme Court provided that when determining reasonableness, the "trier of fact is to be guided by the rules stated in 4 Restatement on Torts 2d 108-142, Sections 822-831." *Id.* Pursuant to the Restatement on Torts, the following factors are relevant to determining the gravity of harm caused by the flow of water: (a) the extent of the harm involved; (b) the character of the harm involved; (c) the social value that the law attaches to the type of use or enjoyment invaded; (d) the suitability of the particular use or enjoyment invaded to the character of the locality; and (e) the burden on the person harmed of avoiding the harm. *Id.; Aeh v. Madison Twp. Trustees*, 4th Dist. Scioto No. 03CA2885, 2004-Ohio-2181. To determine the utility of the conduct involved, the trier of fact should consider: (a) the social value which the law attaches to the primary purpose of the conduct; (b) the suitability of the conduct to the character of the locality; (c) whether it is impracticable to prevent or avoid the invasion, if the activity is maintained; and (d) whether it is impracticable to maintain the activity if it is required to bear the cost of compensating for the invasion. *Id.*

{¶47} Appellant argues the jury's verdict was against the manifest weight of the evidence because the evidence presented at trial unequivocally demonstrated appellee's

development project redirected and diverted extreme volumes of surface water onto appellant's property and this was not reasonable use because the harm to appellant outweighed the utility to appellee. In support of his argument, appellant points to the testimony of appellee's witnesses, who admitted the project altered the natural flow of the water on the Ball property. Appellant characterizes Schroeder's admission that the project increased the surface area of water that flowed south from 5 acres to 11.2 acres as an admission that appellee "drastically" increased the amount and volume of water flowing onto appellant's property.

{¶48} Upon review of the record, we find there is competent and credible evidence to support the jury's verdict. The jury did not clearly lose its way; nor did the jury's verdict create a manifest miscarriage of justice. While appellant testified his fields were constantly soggy, and there was frequently water gushing out of the waterway onto his land, Hersher testified he has viewed both properties when they were both dry. Hersher has never seen water rushing down the driveway over Millerton Road and onto appellant's property. Sliwinski stated when he viewed appellant's property, the swell was dry and there was vegetation in the waterway. Barnes likewise testified when he saw appellant's swell, it was dry. Schroeder described water coming out of the culvert on one of his visits as approximately two inches high with no ponding or flooding on either property and during another visit, noted appellant's swell was dry and heavily vegetated.

{¶49} While appellant testified there is an unreasonable amount of water on his land post-construction, Barnes testified the stormwater management plan of appellee was reasonable and very conservative. Schroeder stated appellee's use of property and construction of stormwater system is reasonable and had a minimal adverse impact on

appellant's property.  It is well-established that when there is a conflict in the testimony on any subject, the question is one for the trier of fact.  *Shadle v. Morris*, 5th Dist. Stark No. 2012CA00073, 2013-Ohio-906.

{¶50}   As to appellant's argument concerning the water not being metered out (the "driveway water"), Schroeder testified that while the development may somewhat affect the flow of this water, it ends up at the same place as it did pre-development.  Appellant cites Schroeder's testimony that the acreage of surface water not going into the basin increased as evidence that the verdict was against the manifest weight of the evidence. However, Schroeder also testified that this water ends up the same place as it did pre-development and even water that seeps into the ground (pre-construction) instead of hitting concrete (post-construction) eventually goes southwest into the ditch.  Further, Schroeder stated that ten of the 11.2 acres flows from adjacent properties, not appellee's property.  Barnes testified that while increased volume in terms of acreage is an important number, it is only a starting point in the analysis.  Sliwinski testified that though there is going to be more water with development since it cannot soak as well into the ground, increased volume does not mean the system is insufficient; the system is sufficient because the basin meters out the water in a controlled fashion and the water diverted around the basin is primarily off-site water that was routed to the ditch pre-development. McCullough testified to an increase in volume of water, but only completed a preliminary report for appellant, and did not investigate groundwater or investigate how much water left appellee's land pre-construction.

{¶51}   Appellant further argues since appellee admitted the development project altered the natural flow on the Ball property, the harm to appellant "far outweighed" the

utility of the project and caused appellant "severe economic damage." Hersher testified to the utility of the project. While appellant testified at trial that the value of his land decreased by $240,000 post-construction, he confirmed his deposition testimony that an appraiser recently valued the property at $1,000,000. Pursuant to *McGlashan*, it is the trier of fact who weighs the gravity of the harm against the utility of the project. See *Aeh v. Madison Twp.* Trustees, 4th Dist. Scioto No. 03CA2885, 2004-Ohio-2181 (the rule requires the harm to be significant, and also practical for the defendant to avoid the harm if feasible based on the costs involved; no evidence alternative exists at a cost less than the cost of the harm). The trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216.

{¶52} Finally, though appellant contends that increased total surface area of water flowing to his property alone is inherently unreasonable, this is not the standard as set forth by the Ohio Supreme Court. The standard is whether, taking into account the specific factors listed, the use is reasonable. The trier of fact determines the reasonableness of appellee's conduct.

{¶53} The trial court instructed the jury on the reasonable-use rule and included in the jury instructions the factors relevant to determining the gravity of the harm and the factors to determine the utility of the conduct involved, as found in the Restatement of Torts. The jury in this case determined, after considering all the factors, that appellee acted reasonably under the circumstances in the case. We find the jury did not clearly lose its way and did not create such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

{¶54} As detailed above, this Court does not weigh the evidence or judge the credibility of the witnesses. We find there is competent and credible evidence to support the jury's determination, considering all of the attendant circumstances, that appellee's design and construction of the drainage system was reasonable.

{¶55} Appellant's first assignment of error is overruled.

II.

{¶56} In his second assignment of error, appellant contends the trial court committed error in not granting his motion for judgment notwithstanding the verdict.

{¶57} Civil Rule 50(B) governs motions for judgment notwithstanding the verdict. When ruling on a motion for JNOV, a trial court applies the same test as in reviewing a motion for a directed verdict. *Ronske v. Heil Co.*, 5th Dist. Stark No. 2006-CA-00168, 2007-Ohio-5417; *Pariseau v. Wedge Products, Inc.*, 36 Ohio St.3d 124, 522 N.E.2d 511 (1988). In reviewing a motion for JNOV, courts do not consider the weight of the evidence or the witness credibility; rather, courts consider the much narrower legal question of whether sufficient evidence exists to support the verdict. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 693 N.E.2d 271 (1998). In other words, if there is evidence to support the nonmoving party's side so that reasonable minds could reach different conclusions, the court may not usurp the jury's function and the motion must be denied. *Osler v. City of Lorain*, 28 Ohio St.3d 345, 504 N.E.2d 19 (1986). Appellate review of a ruling on a motion for JNOV is de novo. *Midwest Energy Consultants, L.L.C. v. Utility Pipeline, Ltd.*, 5th Dist. Stark No. 2006CA00048, 2006-Ohio-6232.

{¶58} Specifically, appellant argues the reasonable use doctrine should be limited as a matter of law. Appellant contends *McGlashan's* focus on the facts of each case leads to a lack of guidance on the reasonableness standard. Appellant encourages this Court to adopt the New York Rule, which provides that landowners making improvements to their land are not liable for damages caused by any resulting flow of surface water onto abutting property as long as the improvements are made in a good faith effort to enhance the usefulness of the property and no artificial means, such as pipes and drains, are used to divert the water thereon.

{¶59} In *McGlashan*, the Ohio Supreme Court has clearly set forth the reasonable use test as the appropriate rule to be used in resolving surface water disputes and specifically rejected other common-law theories of liability for surface waters. We decline to adopt the New York Rule, as it contradicts the rule set forth in *McGlashan*. According to the doctrine of stare decisis, "courts [should] follow controlling precedent, thus creating stability and predictability in our legal system." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256. The Ohio Supreme Court has decided the issue. Thus, this Court, like the trial court, is bound by the doctrine of stare decisis to apply the reasonable use doctrine as set forth in *McGlashan*, not the New York Rule.

{¶60} Additionally, we disagree with appellant's argument that *McGlashan* does not provide appropriate guidance in applying the reasonable use doctrine. The Court made clear, in establishing the reasonable use doctrine, that it sought to change the old procedure used to resolve surface water controversies, which centered on property-based doctrines, as they consisted of "inflexible doctrines difficult to apply in varying circumstances." *McGlashan v. Spade Rockledge Terrace Condo. Dev. Corp.*, 62 Ohio

St.2d 55, 402 N.E.2d 1196 (1980). Instead, the Court sought a more equitable result centering on the reasonableness of the defendant's conduct considering all the circumstances. *Id.* The Court found, "the situation of all adjoining landowners of land is not the same, and as the circumstances attending the use of land in view of the flow of surface water are infinitely various" substantial justice cannot be attained, "by the enforcement in all cases of a rule of law which does not recognize these important differences." *Id.* Rather a reasonable-use analysis "is more likely to provide both flexibility and certainty than any of the property-based doctrines." *Id; Joseph v. Wyss*, 72 Ohio App.3d 199, 594 N.E.2d 142 (3rd Dist. Hardin 1991) (holding that property-based doctrines dealing with diffusion of surface water were abolished by *McGlashan*).

{¶61} Further, in *McGlashan*, the Court provided detailed guidance as to how a factfinder should determine reasonableness. The Court explained how to determine reasonableness (balance the gravity of the harm against the utility of the conduct) and specifically stated the trier of fact should be guided by the rules stated in 4 Restatement on Torts 2d 108-142, Sections 822-831.

{¶62} Finally, we do not interpret the two cases cited by appellant as a trend towards "limiting" the reasonable use rule.

{¶63} The Eleventh District, in *Blashinsky v. Topazio*, cited the common law rule concerning water and upper and lower servitudes; however, the court also specifically noted the common law rule had recently been overruled by *McGlashan*. 11th Dist. Lake No. 11-113, 1987 WL 9942 (April 17, 1987). Instead of completing the reasonable-use analysis, the decision focused solely on whether appellant held an easement or license to discharge underground water (not run-off from surface waters) on appellee's land due

to the specific facts of the case. *Id.* Blashinsky entered onto an abutting property owner's land, excavated a trench, attached a long flexible pipe to the storm sewer and ran the pipe underground to the bluff on the storm sewer at the front of the neighbor's property. *Id.* Thus, the outcome of the case did not depend on the application of the reasonable use rule.

{¶64} In *Len Ran, Inc. v. Mellott*, the court cited *McGlashan,* stating "such facts could well be found to be unreasonable under the logic of *McGlashan.*" 63 Ohio App.3d 123, 577 N.E.2d 1185 (11th Dist. Portage 1990). The Eleventh District also specifically deferred to the trial court's finding of unreasonableness and determined that while "installation of downspouts, sump pumps, and drains are not unreasonable in and of themselves * * * based on the facts of this case, appellants had no right to divert water" onto the appellee's land. *Id.* (recognizing the weight of evidence and credibility of the witnesses are primarily for the trier of fact). The Eleventh District did not limit the reasonable use rule, but affirmed the trier of fact's determination that the use was unreasonable based on the specific facts of the case.

{¶65} Accordingly, we find the reasonable use doctrine, as set forth by the Ohio Supreme Court in *McGlashan*, should not be limited as a matter of law. Thus, the trial court did not commit error in overruling appellant's motion for judgment notwithstanding the verdict. Appellant's second assignment of error is overruled.

{¶66} Based on the foregoing, appellant's assignments of error are overruled.

{¶67} The October 17, 2019 jury verdict, the October 18, 2019 judgment entry of the Stark County Court of Common Pleas entering judgment on the verdict, and

December 19, 2019 judgment entry denying appellant's motion for judgment notwithstanding the verdict are affirmed.

By Gwin, P.J.,

Baldwin, J., and

Wise, Earle, J., concur

.